[No. B212274. Second Dist., Div. Six. Mar. 23, 2009.]

M.L., Petitioner, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
VENTURA COUNTY HUMAN SERVICES AGENCY, Real Party in
Interest.

522

**COUNSEL**

Mary C. Sullivan, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Noel A. Klebaum, County Counsel, and Oliver G. Hess, Assistant County Counsel, for Real Party in Interest.

**OPINION**

**GILBERT, P. J.**—A mother leaves the hospital an hour after her child is born. Both the mother and her newborn test positive for amphetamines. Here we hold a social worker may remove the child from the mother's custody because there is reasonable cause to believe that the child is in imminent danger.

M.L. (Mother) petitions for an extraordinary writ and challenges orders of the juvenile court denying family reunification services, denying placement of her newborn for private adoption, denying dismissal of the dependency, and setting a permanent plan hearing. (Welf. & Inst. Code, § 366.26.)[1] We deny the petition.

---

[1] All statutory references are to the Welfare and Institutions Code.

## FACTS AND PROCEDURAL HISTORY

On September 29, 2008, Ventura County Human Services Agency (HSA) filed a dependency petition pursuant to section 300 on behalf of newborn L. HSA alleged that hospital laboratory tests revealed the presence of amphetamines in Mother and the newborn at birth. HSA alleged that Mother has a long history of substance abuse, and that her six older children were dependents of the juvenile court in 2006 and 2007. Mother did not reunify with the children and she continues to suffer from substance abuse. HSA also alleged that the identity and whereabouts of the newborn's father are unknown. (§ 300, subds. (b), (g), (j).)

In early September 2008, Mother had contacted Family Connections Christian Adoptions (Family Connections). Social worker Lee Ann Skylstad of Family Connections interviewed Mother and sought adoptive parents for the yet unborn child. Skylstad stated that Mother did not ask about any prospective adoptive parents and preferred that Family Connections select an appropriate adoptive family. Wayne Mott, the regional administrator of Family Connections, also requested Mother to select an adoptive family, but she refused. Skylstad also stated that Mother demanded more expense funds than most birth mothers assisted by Family Connections, and rejected their entreaties to obtain prenatal care.

Mother admitted to Skylstad that she had abused drugs in the past, but stated that she had been drug free for the last eight years. She admitted that her older children were dependent children, but explained that her boyfriend was responsible for their neglect and abuse.

Later that month, Mother entered the hospital to give birth. Skylstad accompanied her. Mother gave birth at 11:21 p.m., and discharged herself from the hospital one hour later. Prior to leaving the hospital, Mother executed state adoption form AD 22—"Health Facility Minor Release Report" (AD 22 report). This revocable release permitted the hospital to release physical custody of the newborn to Family Connections. The hospital had received notice of Mother's adoption plan through Family Connections several weeks earlier. Mother and Skylstad discussed returning to the hospital the following day to meet the adoptive parents and to take photographs.

The following morning, the prospective adoptive family learned of the positive toxicology tests and declined to proceed with the adoption. Family Connections contacted a second prospective adoptive family (Adoptive

Parents B), who decided to proceed with the adoption despite the toxicology test results. The adoptive parents arrived at the hospital near noon that day, and spent the day and evening with the newborn.

That same evening, Mother and attorney Michelle Erich telephoned the hospital nursery and informed the charge nurse that Mother was revoking her consent to release the newborn to Family Connections. Erich stated that she and Mother would arrive at the hospital shortly and that Mother had selected different adoptive parents (Adoptive Parents C).

When Erich and Mother arrived, hospital nurses observed Mother to be "flighty, . . . hyper, [and] talking very fast." Erich and Mother attempted to provide the hospital with adoption papers for Adoptive Parents C, but the hospital nurses refused to accept them. The nurses telephoned a supervisor, who in turn contacted the hospital administrator and the hospital general counsel for advice. They were directed not to accept any legal documents and to request that all parties, including Adoptive Parents B, leave the hospital. The nurses were also instructed to contact HSA.

That same evening, the HSA hotline received a report from hospital employees stating that Mother and the newborn had positive toxicology tests for amphetamine and that Mother discharged herself from the hospital shortly after giving birth. The report stated that Mother had arranged for a private adoption but now had selected different adoptive parents. The report stated: "The mother and [her] lawyer are attempting to take the child from the hospital."

HSA social worker Danielle Gersh arrived at the hospital nursery at approximately 9:30 p.m. that evening. She inspected the newborn's medical records and noted the AD 22 report in favor of Family Connections and the hospital social worker's notes. The nurses informed Gersh that Mother also had positive amphetamine toxicology tests several months earlier during an emergency room visit. They advised Gersh that Mother had revoked the release for Family Connections.

Gersh telephoned Mother but did not receive any response. She realized that Mother had revoked the Family Connections adoption plan and did not see documents pertaining to a successor plan. Gersh feared that Mother would return to the hospital and remove the newborn. She then decided to detain the infant. Afterwards, Gersh and police officers went to Mother's apartment but did not find her there.

The following morning, another HSA social worker spoke with Mother, who stated that she believed that Family Connections did not find any adoptive parents because none were present at the birth. She also stated that she left a telephone message for Skylstad and informed her that she had selected Adoptive Parents C. Mother explained the positive toxicology tests as the result of her consumption of "diet pills" to treat depression.

The next day, Mother signed an adoption placement agreement with Adoptive Parents C, who immediately filed an adoption petition. Later that day in juvenile court, Mother executed a formal waiver of the right to rescind the adoption agreement. She did not inform the court that HSA had detained the newborn, or that she and the newborn had positive toxicology test results. Adoptive Parents C then provided copies of these documents to HSA.

Three days after the birth, the hospital discharged the newborn and HSA placed her with Adoptive Parents B, who are licensed foster parents. Adoptive Parents C were not then licensed foster parents.

On September 30, 2008, the juvenile court held a detention hearing at which Mother and Adoptive Parents C were present. Adoptive Parents C filed written objections, and Mother requested that the court dismiss the dependency petition. The court denied the objections, detained the newborn, and ordered HSA to arrange for the temporary care and placement of the infant.

On November 19, 2008, the juvenile court held a contested jurisdiction and disposition hearing. Adoptive Parents C and their attorney were present and filed objections to the court's jurisdiction. The court excluded them from the hearing, however, deciding that they had no standing in the dependency matter. The court received documentary evidence and testimony from Mother, HSA social worker Gersh, attorney Erich, and other witnesses.

Mother testified that she did not use methamphetamine near the time of the birth and had no explanation why the toxicology test results were positive. She stated that she informed Family Connections that she wanted the adoptive parents present at the birth and that she wanted to meet them.

Following presentation of evidence, Mother moved for "summary judgment," which the juvenile court denied. The court then sustained the allegations of the dependency petition, continued the newborn in foster care, bypassed reunification services, and set the matter for a permanent plan hearing pursuant to section 366.26.

Mother seeks an extraordinary writ, requesting that we reverse the jurisdiction order, vacate the setting of the permanent plan hearing, and order the juvenile court to dismiss the dependency, among other things.

## DISCUSSION

### I.

Mother argues that the juvenile court erred by not dismissing the dependency petition pursuant to section 305.6, subdivision (a), because HSA did not investigate the safety of the newborn in placement with Adoptive Parents C prior to detaining the infant. Subdivision (a) provides: "Any peace officer may, without a warrant, take into temporary custody a minor who is in a hospital if the release of the minor to a prospective adoptive parent poses an immediate danger to the minor's health or safety."

Mother also asserts that the juvenile court erred by not dismissing the dependency petition pursuant to section 305.6, subdivision (b)(1), because she attempted to present another AD 22 report in favor of Adoptive Parents C prior to the HSA referral, the HSA detention, the filing of the dependency petition, and release of the newborn. Subdivision (b)(1) requires "a peace officer" to obtain a warrant to take a newborn into temporary custody where the newborn and/or the birth mother have positive toxicology test results and a completed and executed AD 22 report exists, among other things. Mother adds that she and Adoptive Parents C signed an adoption placement agreement prior to the newborn's release from the hospital. (§ 305.6, subd. (b)(4) [an executed adoption placement agreement may substitute for the AD 22 report in § 305.6, subd. (b)(1)].)

Mother contends the juvenile court abused its discretion by not recognizing the adoption placement agreement and her waiver of the right to revoke consent to the adoption by Adoptive Parents C. She also argues that the court denied her and Adoptive Parents C due process of law by not holding a hearing to review the taking of the newborn pursuant to section 305.6. Finally, Mother asserts that the court erred in finding exigent circumstances allowing HSA to take the newborn into protective custody pursuant to section 306.

For several reasons, we reject these contentions.

■ First, section 305.6 by its plain language refers to peace officers, not social workers. The fair reading of the statute is that the Legislature intended it to apply only to peace officers and did not intend it to limit the authority of social workers to detain a minor without a warrant pursuant to section 306.

Moreover, by its terms the section does not require a "probable cause" hearing regarding the taking of a minor.

Second, HSA properly detained the newborn at the hospital after the adoption plan with Family Connections was revoked and before the plan with Adoptive Parents C was documented. (§ 306, subd. (a)(2).) The temporary detention allowed HSA time to investigate further and decide whether to file a section 300 petition for the newborn. Although Mother executed documents the day following the hospital detention, HSA by then had lawful custody of the newborn. Once HSA filed the dependency petition, the juvenile court would determine the best interests of the newborn.

■ Social workers constitutionally may remove a child from the custody of a parent without prior judicial authorization if the information they possess at the time of seizure provides reasonable cause to believe that the child is in imminent danger. (*Wallis v. Spencer* (9th Cir. 1999) 202 F.3d 1126, 1138 [state may not remove minor from parent's custody without court order unless specific, articulable evidence provides reasonable cause to believe child is in imminent danger]; *Moodian v. County of Alameda Social Services* (2002) 206 F.Supp.2d 1030, 1033–1034 [citing judicial precedent].) Section 306, subdivision (a)(2) empowers a social worker to take a child into temporary custody under certain circumstances, without a warrant, if the child is in immediate danger. (*Ibid.* ["Any social worker in a county welfare department . . . may . . . [¶] . . . [¶] (2) Take into and maintain temporary custody of, without a warrant, a minor . . . who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of Section 300, and the social worker has reasonable cause to believe that the minor has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety."].)

■ Here the newborn was 24 hours old and had been exposed to drugs during gestation. Mother had received little prenatal care and, one year earlier, had exposed another child to drugs during gestation. She discharged herself from the hospital within an hour after giving birth and could not be reached by telephone or a visit to her home. The following evening, she appeared at the hospital in an agitated and flighty condition, and revoked the AD 22 report in favor of Family Connections. HSA social worker Gersh reasonably concluded that Mother might return to the hospital and remove the newborn against medical advice and thereby endanger her. Any AD 22 report in favor of Adoptive Parents C was, at that point in time, revocable. Thus sufficient evidence supports the juvenile court's finding of exigent circumstances.

## II.

Mother argues that the juvenile court denied her due process of law by not allowing her to present evidence at the detention hearing, by denying her a contested detention hearing, and by denying her a contested jurisdiction and disposition hearing. (§ 319.) She also contends that the court abused its discretion by not dismissing the dependency petition because the newborn was not in danger of continuing harm because she irrevocably agreed to adoption by Adoptive Parents C. Mother contends that HSA did not make reasonable efforts to prevent the detention of the newborn, pointing out that Adoptive Parents C were ready to receive the infant. She adds that the court's decision denies her the constitutional right to select an appropriate adoptive home for her newborn. Finally, Mother asserts that the court abused its discretion by allowing HSA to place the newborn with foster parents.

Mother's arguments are without merit. Mother did not request a detention rehearing or an expedited evidentiary hearing within 10 days pursuant to section 321. Mother received a full evidentiary hearing at the contested jurisdiction and disposition hearing. She has waived her rights regarding the detention hearing by not objecting or requesting a rehearing.

█ Once the juvenile court sustains the allegations of the dependency petition, the court has an independent obligation to determine the best interests of the child. (*Taylor M. v. Superior Court* (2003) 106 Cal.App.4th 97, 109 [130 Cal.Rptr.2d 502].) The court is not required to defer to Mother's selection of adoptive parents for her child.

Mother does not describe the reasonable efforts HSA could have made to preclude the detention, except to state that it could have placed the newborn with Adoptive Parents C. As discussed herein, however, at the time social worker Gersh detained the newborn, she was unaware of any adoption plan in favor of Adoptive Parents C or any irrevocable consent by Mother to that adoption. Gersh knew that Mother had a significant child welfare history, a long history of drug abuse, and a failure to rehabilitate her substance abuse problem and reunify with her children. Mother behaved erratically at the hospital, leaving precipitously after giving birth and then returning with new adoptive parents.

Although Mother has a recognized constitutional right to select adoptive parents for her child, the juvenile court is charged with determining whether that plan or another is in the best interests of the child. (*Taylor M. v. Superior Court, supra*, 106 Cal.App.4th 97, 109.)

■   Finally, the juvenile court may make a general placement order under the dependency laws. (*In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1490 [69 Cal.Rptr.2d 1]; *In re Robert A.* (1992) 4 Cal.App.4th 174, 179 [5 Cal.Rptr.2d 438].) The social services agency possesses discretion to place a dependent child under a general placement order. (*Ibid.*)

The petition for extraordinary relief is denied.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied April 16, 2009, and petitioner's petition for review by the Supreme Court was denied June 10, 2009, S172605.