Filed 4/3/14  In re K.T. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.T., et al., Persons Coming Under the Juvenile Court Law. | B247444 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK92143) |
| Plaintiff and Respondent, | |
| v. | |
| JESSICA T., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Valerie L. Skeba, Referee.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Appellant, a minor.

No appearance by Respondent.

_____

Jessica T. (mother) challenges the termination of reunification services regarding her three children: K.T., K.W. and K. (collectively the children). She contends the order was not supported by substantial evidence.[1] In a letter, the Office of the County Counsel informed this court that DCFS was not taking a position on the appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The children were referred to the Department of Children and Family Services (DCFS) for general neglect in January 2012.[2] They were not detained but mother was ordered to drug test. Three months later, mother tested positive for amphetamines and methamphetamines. The children were detained on April 18, 2012. On that date, K.T. was five years old, K.W. four years old and K was 13 months old. The children were eventually placed with a non-relative extended family member. On June 5, 2012, the children were adjudicated dependent children within the meaning of Welfare and Institutions Code section 300, subdivision (b).[3] As sustained, the second amended section 300 petition alleged: mother had an unresolved history of substance abuse beginning in 2009; on April 9, 2012, mother tested positive for methamphetamine while the children were in her care (count B-2); mother has a history of domestic violence with each of the children's fathers, including mutual combat (count B-4); K.W.'s father has a

---

[1]    Each of the children has a different father. K.T.'s and K's fathers could not be located. K.W.'s father participated in reunification but is not a party to this appeal. During these dependency proceedings, mother gave birth to a fourth child, K.B., who was also declared a dependent child. K.B. is not a subject of this appeal.

[2]    A bail fugitive recovery agent went to mother's Palmdale apartment to arrest her on January 21 or 22, 2012, after mother failed to appear at a hearing in a criminal matter. Mother fled, leaving the children with a visitor. Maternal grandmother (grandmother), who lived in the same apartment complex, was contacted and retrieved the children. After finding a methamphetamine pipe in mother's apartment and noting that the apartment was exceedingly dirty and there was no food in the refrigerator, the agent referred the children to DCFS for general neglect.

[3]    All future undesignated statutory references are to the Welfare and Institutions Code.

2

criminal history including convictions for child cruelty and driving under the influence (count B-5); and K's father has a history of substance abuse and is an abuser of methamphetamine (count B-6). The juvenile court ordered monitored visitation for mother; after six consecutive negative drug tests, mother's visits were to be liberalized to unmonitored day visits. A section 366.21, subdivision (e) status review hearing (.21 hearing) was set for December 4, 2012, to determine whether the children could be returned to mother.

In a report filed prior to a hearing on May 15, 2012, DCFS stated mother was receiving treatment for a bipolar disorder but she was not taking psychotropic medication because she was pregnant. In mid- September, DCFS liberalized mother's day visits to unmonitored. At a progress hearing on September 20, the juvenile court ordered mother to have unmonitored weekend/overnight visits if she was in compliance with the case plan two weeks from the date of the hearing.

For a November 8, 2012 progress hearing, DCFS reported that mother had 10 negative drug tests, one no-show and one positive test for opiates/hydrocordone. Regarding the positive test, mother explained she had been prescribed pain medication after having an abscess treated, but she never gave DCFS a copy of the prescription. Notwithstanding the two questionable drug tests, DCFS reported that mother was "actively working her case plan; completing Court ordered services and following visitation guidelines. Mother continues to be consistent in her visitation with her children. The children have reported that they enjoy the time spent with their mother. Mother appears to be very motivated in having her children returned to her care and has and continues to demonstrate ongoing compliance with her case plan activities and her criminal court requirements as well." At the hearing, DCFS expressed some concern that there had been some domestic violence between mother and her boyfriend, Gil. The juvenile court ordered DCFS to investigate and gave DCFS discretion to reduce mother to monitored visits pending the .21 hearing on December 4. Mother did not appear for an on-demand drug test that day. On November 19, 2012, mother tested negative but had "a very high water content."

3

On November 23, 2012, mother was arrested in Irvine for driving with a suspended license and spent several nights in jail. Mother told the social worker that she had agreed to drive Gil to Irvine in exchange for his promise to pay her. The van mother used did not have current tags. Gil drove to Irvine while mother slept. Unbeknownst to mother, Gil was drinking beer while driving. When she woke up, mother told Gil to pull over, but he refused. After mother opened the door to jump out, Gil crashed into a pole. Mother was trying to move the car so that it would not get towed when police arrived and arrested her on several outstanding bench warrants and for driving without a license and without a current registration; Gil was arrested for driving without a license and driving under the influence.

According to the report for the .21 hearing on December 4, mother denied any domestic violence between herself and Gil, who used to live in the same apartment complex; Gil moved after mother broke off their relationship. But when the children seemed evasive in response to questions about whether mother had a boyfriend, the social worker concluded that they had been coached. Nevertheless, the report stated that the "family has been doing well. The children are well adjusted in their current caregiver's home." The children told the social worker that they enjoyed their time with mother and wanted to "go home." Mother "appeared to be doing well and in compliance with her case plan. However, during the past three weeks mother's behavior has come into question. . . . [Mother's] judgment in allowing [Gil] to drive her while intoxicated is extremely questionable." Although the hearing notice indicated that DCFS was recommending the children be returned to mother, the Irvine incident had caused DCFS to seek a 90-day continuance of the .21 hearing for further information gathering, including a copy of the arrest report. DCFS recommended continued reunification services. On the day of the hearing, mother obtained a criminal protective order against Gil. The hearing was continued to January 16, 2013.

According to the Supplemental Report for the continued .21 hearing, the arrest report confirmed that there were no domestic violence charges arising out of the Irvine incident. Nevertheless, DCFS remained concerned about mother's judgment and

4

recommended that it continue making unannounced visits during the children's unmonitored visits with mother to assure the children's well-being. At the hearing, mother testified that she completed a 10-month drug program and attended domestic violence counseling. Mother believed that the children should be returned to her care. She visited the children almost every day and had them for weekends. Regarding the Irvine incident, mother explained that she began dating Gil in March 2012. The children knew Gil as a friend of mother's, not as her boyfriend. Mother was aware that Gil drank with other people in the apartment courtyard, but did not know he had a drinking problem until he lost his job in September. Mother ended the relationship in early October because she did not want him around the children. Sometime later, Gil had been drinking when he tried to talk to mother as she was getting in the car to take the children back to the foster home. Gil put his hand on mother to stop her from getting in the car, but she got into the car and drove away. Gil did not hit or push mother. Mother later discovered she was pregnant with Gil's child.[4] In November, Gil offered mother $50 to drive him to Union Station, so that he could take the train to Irvine, where he now worked. Although her driver's license was suspended, mother believed the drive from Palmdale to Union Station presented a good opportunity to discuss her pregnancy with Gil. Mother dropped off the children at their foster home before she picked up Gil. Mother would not have agreed to drive Gil anywhere if the children had been with her. When they arrived at Union Station, Gil still had four hours before his train, so they stayed in the van talking. Gil drank two beers from a case he was bringing with him to Irvine; mother did not know whether Gil had been drinking before she picked him up but he did not seem intoxicated. Mother and Gil both fell asleep and when they woke up five hours later, Gil had missed his train. Mother agreed to drive Gil to Irvine, for an additional $50. On the way there, mother became sleepy so Gil took over driving. While mother was asleep in the back of the van, Gil drank more beer. According to the police report, there were 10 empty 12 ounce beer cans in the back of the van, and one empty 24-ounce beer can. When mother

---

[4]     Mother had a miscarriage.

5

woke up and smelled the beer, she told Gil to stop but he refused. Mother did not hit Gil and Gil did not hit mother, but they argued and Gil crashed the car. Mother obtained a restraining order against Gil at the suggestion of a friend and she had not seen him since the Irvine incident. Gil never harmed or threatened to harm mother or the children. After her arrest in Irvine, mother resolved the outstanding bench warrants. In retrospect, mother realized that driving Gil anywhere was a bad idea.

DCFS recommended continued reunification services. The minors' counsel agreed. Mother argued that she was making progress and requested that at least two of the children be released to her. Alternatively, mother requested more frequent visitation.

The juvenile court disagreed with the DCFS recommendation. It disbelieved mother's description of events leading up to the car crash and mother's arrest in Irvine. The juvenile court observed, "[T]he accident occurred at eight o'clock in the morning. [¶] The drinking must have been the night before. [¶] And I mean what kind of reasonable person would drive somebody to their employment . . . when there's that kind of drinking going on. [¶] That's just beyond unreasonable and irresponsible. [¶] And to let him on the freeway and endanger other people like that, that's just completely unacceptable. [¶] And, you know, the sad part is that it shows me that mother has made absolutely no progress whatsoever in fixing the poor judgment that she had involving herself with these other men who abused her. [¶] And, you know – and I do believe that [Gil] was also abusive to her . . . her explanation doesn't make any sense. [¶] . . . [¶] I think mother's testimony was very deceptive. I just don't see that she has any judgment whatsoever, and she appears to have no respect for the law. [¶] To allow somebody to drive her vehicle who was drinking that much, incredibly irresponsible, illegal." The juvenile court concluded that mother had done her programs but nothing had changed "[a]nd I just do not see what further things we can order that will make a difference." For this reason, it terminated mother's reunification services as to all three children, and ordered DCFS to provide mother and the children permanent placement services. The matter was continued for a progress hearing on February 14, 2012, at which setting the matter for a permanent plan hearing would be discussed. Mother timely appealed.

6

## DISCUSSION

Mother contends the order terminating her reunification services was not supported by substantial evidence. She argues that the juvenile court was required to find by clear and convincing evidence that mother (1) failed to participate regularly in the case plan, (2) did not make substantial progress and (3) there was no substantial probability that the children would be returned to mother by the next review hearing, but did not make any of these findings. We find no error.

The standard of review of an order terminating reunification services is well settled. We review the order to determine if it is supported by substantial evidence. " 'In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." [Citation.]' [Citation.]" (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028 (*Fabian*).)

Reunification services are governed by section 361.5. With exceptions not relevant here, when a sibling group is removed from their parent's custody at the same time, and one of the siblings is under three years of age at the time of removal (as is the case here), under subdivision (a)(1)(B) and (C) of section 361.5, the family is entitled to a minimum six months of reunification services from the date of the dispositional hearing, but not more than 12 months from the date the sibling group entered foster care. The juvenile court has discretion to extend reunification services for up to 24 months from the date the child enters foster care under some circumstances.[5] But when the child is under

---

[5]    The juvenile court has discretion to extend reunification services for an additional 12 months (a total of 18 months from the initial detention) "if it can be shown, . . . that the permanent plan . . . is that [the child] will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period . . . ." (§ 361.5,

7

three years of age on the date he or she enters foster care, the presumptive rule is that reunification services shall not exceed six months because the unique developmental needs of infants and toddlers justifies a greater emphasis on establishing permanency early in dependency proceedings in cases with a poor prognosis for reunification. (*Fabian, supra*, 214 Cal.App.4th at p. 1027.)

For children placed in foster care, section 366, subdivision (a)(1) requires the juvenile court to hold status review hearings every six months. At each such hearing, the juvenile must consider the "extent of progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care." (§ 366, subd. (a)(1)(E).) No sooner than the first six month review hearing after the dispositional hearing and no later than 12 months after the child entered foster care, the juvenile court must order the child returned to his or her parents "unless the court finds, by a *preponderance of the evidence*, that the return . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (e), italics added; see *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 177.) In the case of a sibling group which includes a child under three years of age on the date of removal, the juvenile court may set a section 366.26 hearing within 120 days of the .21 hearing if it finds by "clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e).) If the juvenile court finds there is a substantial probability that the sibling group may be returned to the parent within six months, the juvenile court "shall continue the case to the 12-month permanency hearing." (§ 366.21, subd. (e).)

---

subd. (a)(3).) Reunification services may be extended for another six months (a total of 24 months from the initial detention) upon a finding that to do so is in the child's best interest and that there is a substantial probability that the child will be reunified with the parents within the extended time period. (§ 361.5, subd. (a)(4).)

8

The .21 hearing provides the juvenile court "with the option to terminate reunification efforts after six months where the parents have made little or no progress in their service plans and the prognosis for overcoming the problems leading to the child's dependency is bleak." (*Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 612.) A finding of substantial compliance with a case plan does not compel a finding of substantial progress towards reunification. (*Fabian, supra*, 214 Cal.App.4th at p. 1029.) In *Fabian*, an incarcerated father challenged the termination of reunification services at the six-month review hearing regarding his three-year-old daughter. While incarcerated, the father had taken advantage of vocational services, kept in consistent contact with his daughter and engaged in a self-study course of parenting with materials supplied by the social worker. The appellate court commended the father for his efforts, but found those efforts insufficient to compel reversal of the order terminating reunification services. It reasoned that the father had been provided reasonable services; but he would not be released from prison until the child had been in the dependency system for 18 months without a permanent placement, and 18 months was outside the time limit for all children absent extraordinary circumstances not present in that case. For these reasons, it found no abuse of discretion by the juvenile court. (*Id*. at pp. 1031-1032.)

Here, because K was under than three years of age when the children were detained on April 18, 2012, mother was presumptively entitled to a minimum of six months of reunification services from the dispositional hearing on June 5, 2012 (i.e., until December 5, 2012), but no more than 12 months from April 18, 2012, which was the date the children were detained and placed in foster care (i.e., until April 18, 2013). (§ 361.5,subd. (a)(1)(B) & (C).) The .21 hearing on January 16 and 17, 2013, fell within that range – it was seven months after the dispositional hearing and nine months after the children were detained and placed in foster care. At the hearing, in accordance with section 366.21, subdivision (e), the juvenile court found by a preponderance of the evidence that return of the children to mother's custody would create a substantial risk of detriment to the children's emotional health and safety; although mother had substantially complied with her case plan, she "has not benefitted from it whatsoever." In terminating

9

reunification services, it found mother had made virtually no progress towards resolving the domestic violence issues that, along with mother's substance abuse, brought the children into the dependency system. Mother's conduct leading up to the car crash in Irvine constitutes substantial evidence to support this finding. As noted by the juvenile court, mother flouted the law by driving with a suspended license; she risked her own life as well as that of her unborn child and every other person on the highway by allowing Gil to drive her car while he was intoxicated. The juvenile court did not believe mother's claim that she did not know Gil had been drinking and we will not reevaluate that credibility determination.

We are unpersuaded by mother's argument that the third paragraph of section 366.21, subdivision (e) requires the juvenile court to find by "clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan," before it can terminate reunification services. The third paragraph of subdivision (e) of section 366.21 governs the findings necessary before the juvenile court can set a section 366.26 hearing, known as a "permanent plan hearing" (.26 permanent plan hearing) within 120 days. (See *M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 522.) In this case, at the conclusion of the .21 hearing on January 17, the juvenile court continued the matter to February 14 for a progress hearing regarding setting the matter for a permanent plan hearing. Since the juvenile court did not set a section 366.26 hearing at the conclusion of the .21 hearing on January 17, the juvenile court was not required to make any findings by clear and convincing evidence.

Mother has asked this court to take judicial notice of a March 11, 2013 minute order setting the matter for a .26 permanent plan hearing on June 13, 2013. Although that minute order does not state that the juvenile court made any findings by clear and convincing evidence, the record does not include a copy of the Reporter's Transcript from the March 11 hearing. Accordingly, we have no way of knowing what findings were made at that hearing.

10

## DISPOSITION

The order terminating mother's reunification services is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.

GRIMES, J.

11