Filed 2/24/22  In re Z.S. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re Z.S., a Person Coming Under the Juvenile Court Law. | B309645 |
| | (Los Angeles County Super. Ct. Nos. 20CCJP05841, 20CCJP05841A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| S.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Dismissed in part; affirmed in part.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Casto-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

The Los Angeles County Department of Children and Family Services (DCFS) placed mother S.M.'s daughter, Z., in protective custody shortly after her birth. DCFS subsequently filed a petition alleging Z. was at substantial risk of suffering serious physical harm or illness due to mother's substance abuse and mental and emotional problems.  (Welf. & Inst. Code, § 300, subd. (b)(1).)[1]  The juvenile court sustained the petition, removed Z. from mother, and placed her in foster care.  Mother appealed. While her appeal was pending, the juvenile court ordered Z. released to mother and terminated jurisdiction.

Mother contends the detention of Z. at the hospital violated her Fourth Amendment rights, and the jurisdiction and disposition orders were not supported by substantial evidence.[2] Respondent DCFS responds that mother forfeited her Fourth Amendment argument, the jurisdiction and disposition orders were properly supported, and, alternatively, that mother's appeal of the disposition order is moot.  We agree with DCFS that mother has forfeited her Fourth Amendment claim, the

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     In her opening and reply briefs, mother also argued that DCFS failed to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.).  In her supplemental opposition to DCFS's motion to dismiss the appeal as moot, however, mother agreed that her Indian Child Welfare Act claims were moot.  We agree and dismiss this portion of the appeal.

jurisdictional findings were supported by substantial evidence, and mother's challenge to the disposition order is moot. We accordingly affirm the jurisdictional findings and orders and dismiss the appeal to the extent it challenges the disposition order.

## BACKGROUND

*Referral and Detention*

Hospital staff contacted DCFS shortly after Z.'s birth in October 2020, citing concerns about mother's "erratic aggressive" behavior; positive drug test results at admission for amphetamines, benzodiazepine, and cannabinoids; failure to bond with or care for Z.; and threats to leave the hospital before being discharged. Z. was born healthy and tested negative for all substances.

When a DCFS children's social worker (CSW) arrived at the hospital shortly after the referral, mother was calm. According to the CSW, mother admitted she "occasionally" used marijuana for pain, but was "adamant" in her denial of other substance use. She suggested that the "random people on the street" from whom she purchased marijuana may have stored the joints she purchased next to other drugs. Mother reported that Z.'s father had been shot and killed in March 2020. She also reported that she had been homeless until August 2020, when she moved into transitional housing at St. Anne's.

Mother reported that she had been diagnosed with depression as a teenager, after her own mother died in 2013. Mother could not recall the name of the medication she had been prescribed, but stated she "just stopped going to the doctors and taking the medication." Mother said learning she was pregnant with Z. "gave her some joy," and she was also "glad" to have her

3

own apartment at St. Anne's.  Mother said she was willing to participate in parenting classes and therapy, but was "not in the mood" to sign any of the documents the CSW presented.

During the interview, mother stated that she was "ready to leave" and wanted to be home.  When asked about her refusal to comply with a post-partum assessment and attempts to remove her IV and compression boots, mother said she just wanted to leave the hospital.  She also stated she was "stressed out," and shrugged when the CSW asked if she planned to leave before being formally discharged.

The CSW excused herself to consult with her supervisor.  After that conversation, the CSW "explained to mother that due to mother's irrational aggressive behavior with staff, stating she wanted to leave, and drug test results, the child was going to be placed into protective custody."  Mother began to cry and said no one was going to take her baby.  She also "loudly argued" with the nurse who removed Z. from her room.  The nurse assured mother that Z. would be in the nursery and mother could visit her by calling the nurses.

The following day, the hospital social worker called the CSW to report that Z. was ready to be discharged.  She also reported that mother had "not bonded with the child since removing from the room last night," and would not be discharged until the following day.  Mother also called the CSW to give her the name of a family friend who could care for Z.  The family friend later called the CSW and affirmed her willingness to care for Z.  She described mother as "kind and helpful and very mature," and had no concerns about mother abusing substances or engaging in aggressive behavior.

4

Mother was calm when the CSW arrived at the hospital for Z.'s discharge. However, while saying good-bye to Z., mother engaged in a speaker phone conversation in which she and the other participant profanely derided and insulted the CSW. Mother raised her voice, prompting two nurses to come into the nursery and ask her to calm down. Mother lowered her voice but continued to complain to the person on the phone. She then raised her voice again, and Z. and another infant in the nursery began to cry. Two nurses told mother she had to leave the nursery immediately. Mother refused to leave and was escorted out by security. Z. was safely removed from the hospital and transferred to her placement.

*Section 300 Petition*

DCFS filed a section 300 petition the following day. DCFS alleged two counts under section 300, subdivision (b)(1). Count b-1 alleged mother was "a current abuser of amphetamine, benzodiazepine and marijuana, which renders the mother incapable of providing regular care and supervision of the child. On 10/27/2020, at [*sic*] the mother had a positive toxicology screen for Amphetamine, Benzodiazepine and Marijuana. The mother abused substances during the mother's pregnancy with the child. The child is of such young age requiring constant care and supervision and the mother's substance abuse interferes with the mother's ability to provide regular care and appropriate supervision of the child. The mother's substance abuse endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger." Count b-2 alleged mother "has mental and emotional problems including aggression and a diagnosis of Depression which renders the mother incapable of providing regular care and appropriate

5

supervision for the child.  The mother failed to participate in consistent mental health treatment.  The mother failed to take her psychotropic medications as prescribed.  Such mental and emotional problems on the part of the mother endangers the child's physical health and safety and places the child at risk of serious physical harm, damage and danger."

At a November 4, 2020 detention hearing, the court ordered Z. detained from mother.  The court ordered monitored visitation, and gave DCFS discretion to liberalize the visitation and release Z. to mother at St. Anne's.  It also ordered a drug testing referral for mother.

*Jurisdiction/Disposition Report*

DCFS filed a jurisdiction/disposition report on November 25, 2020.  It reported that a CSW interviewed mother on November 18, 2020.  During that interview, mother denied having a drug problem or using amphetamines or benzodiazepine.  She admitted she "smoked weed" and said she used marijuana edibles "to cope with my baby daddy passing away."  Mother also told the CSW she did not understand why the depression she suffered as a teenager was relevant, and asserted that DCFS was "using my history against me."[3]  She acknowledged that she had been aggressive at the hospital, stating, "what did you all expect when they came and took my baby when I had just given birth.  Yeah, I was emotional and mad. I knew what was going on and I don't think I was irrational. I was mad as hell."  Mother also added that she "did demonstrate

---

[3]     Mother and her siblings had an extensive history with DCFS when mother was a minor.  We granted mother's motion to augment the appellate record with documentation of that history.

6

aggressive behaviors due to not knowing how to cope with life circumstances." She stated she had participated in therapy and was "trying really hard to manage my emotions better now." Mother asserted that she was "capable and well-equipped to take care of my baby."

A CSW spoke with a staff member at St. Anne's on November 20, 2020. The staff member reported that mother "appears committed and focused on regaining custody of the child." Mother's therapist at St. Anne's reported that mother completed the intake process on November 2, 2020, and the parenting class facilitator stated that mother had actively participated in three parenting sessions. Mother had not yet enrolled in a substance abuse program, but was in the process of doing so. Mother had been scheduled for two drug tests. The first was a no-show (mother stated she "dropped the cup in the toilet"), but the second, on November 17, 2020, was negative.

A CSW also spoke with mother's maternal great-cousin, T., who had known mother since infancy and had cared for mother during one of mother's dependencies. T. reported that mother had used marijuana in the past, but she had no knowledge of mother using other drugs. T. further stated that she would not have any safety concerns if mother "tests clean for a significant amount of time." T. reported that mother "has a history of aggressive behaviors," including "a very short patience [*sic*]." T. opined that mother's homelessness during the pandemic "has played a big part in her depression."

Z.'s foster mother, who supervised mother's visits with Z., reported that the visits were going well; mother appeared to have a good bond and appropriate interaction with Z. The foster mother also reported that mother appeared depressed due to not

7

having Z. in her custody, and had "indicated" that "experimenting with substances during pregnancy was a mistake."

DCFS stated that it "remain[ed] significantly concerned with the mother's ability to provide the child with a safe and stable home environment due to the mother's history of substance abuse as well as her denial of the substance use." It was also "concerned with the mother's ability to understand the severity of her actions and overall accountability." DCFS accordingly recommended that the petition be sustained and reunification services ordered for mother. Under the heading "Reasonable Efforts," DCFS stated that it had taken the following actions: "noticed the mother for the hearing," "reviewed CWS/CMS for prior child welfare history," "referred the child to the [medical] clinic," "maintains contact with the child to assess the child's well-being," "interviewed all available parties in regards to the current allegations," "maintains monthly visitation with the child," "obtained hospital birth verification for the child," and "obtained hospital toxicology screening."

In a last minute information filed December 11, 2020, DCFS reported that mother had two additional drug tests: a no-show on November 18 and a negative test on December 8. DCFS attempted to contact mother to inquire about the missed drug test, but had not yet heard back from her. Mother's case manager at St. Anne's reported that she and mother were working on enrolling mother in a substance abuse program, and mother "is willing to comply." DCFS informed the court that its recommendation remained unchanged. It opined that it would be in Z.'s best interest for mother to continue to demonstrate sobriety through additional drug testing, learn more effective

8

coping strategies, and improve her understanding of the severity of her actions.

*Adjudication Hearing and Orders*

The court held a combined jurisdiction and disposition hearing on December 15, 2020. DCFS introduced its detention report, jurisdiction/disposition report, notice of hearing, and last minute information. Mother introduced a progress letter from her parenting program and a document showing she had begun therapy.

Counsel for DCFS argued that the court should sustain both allegations. It asserted that mother's denial of amphetamine and benzodiazepine use was implausible, and that her admitted use of marijuana throughout her pregnancy placed Z. at risk, both in utero and due to her very young age. Counsel further argued that mother was using drugs to self-medicate her unresolved mental health issues, and pointed to T.'s statements that mother was quick to anger. Counsel for Z. joined DCFS's arguments.

Mother's counsel urged the court to dismiss the petition. Counsel contended that mother's admitted use of marijuana did not rise to the level of abuse. Citing Z.'s negative drug test, as well as mother's, counsel further argued that DCFS failed to demonstrate a nexus between her use and any risk to Z. Counsel also argued that there was no connection between mother's diagnosis of depression as a teen and her current ability to parent Z. some five to six years later. She also emphasized positive steps mother had taken, such as procuring housing, participating in programming, and engaging with Z. during visits.

The court found the allegations true by a preponderance of the evidence. It specifically "note[d] the tender age of the

newborn child," stated that mother's repeated denial of substance abuse despite her positive test was "somewhat concerning," and added that the evidence showed that mother struggled with the emotional control necessary to care for a newborn in difficult circumstances.

The parties then argued about disposition. Counsel for DCFS reiterated its request that the court suitably place Z. and order reunification services for mother. She argued that visitation should remain monitored, but sought discretion to liberalize if mother produced consecutive clean drug tests. Z.'s counsel again joined DCFS's argument, expressing concern about mother's failure to acknowledge her drug use and take all her drug tests. Mother's counsel argued that Z. should be released to mother's care. She emphasized mother's consistent positive visitation with Z., participation in programs, negative drug tests, and network of support at St. Anne's and within her family.

The court declared Z. a dependent and ordered her removed from mother, based on "unaddressed issues of substance abuse" and a "need to see some more . . . insight . . . in terms of her mental health status." It acknowledged that mother "probably experienced a lot of traumatic stressors in her own life," but stated that "those need to be dealt with so they don't carry over into the life of her child." The court ordered mother to complete a full drug program with after-care and submit to random weekly drug and alcohol testing. It ordered monitored visitation, but gave DCFS discretion to release Z. to mother, provided she completed "four clean consecutive unmissed tests" and continued to reside at St. Anne's. The court also ordered an Evidence Code section 730 evaluation, plus "all standard terms and conditions." Mother timely appealed.

10

*Subsequent Events*

We granted DCFS's request for judicial notice of events that occurred while the appeal was pending.

On January 26, 2021, DCFS filed a last minute information notifying the court that it was liberalizing mother's visits to unmonitored. It noted that mother had five consecutive clean drug tests, was actively participating in all of her services, in which she had made "significant progress," and completed her Evidence Code section 730 evaluation. It further noted that mother had bonded with Z. and attended Z.'s most recent medical appointment.

On February 3, 2021, mother filed a section 388 petition requesting that Z. be placed with her. Mother stated that she had completed her parenting course, was enrolled in both a drug program and individual counseling, and had had five consecutive clean drug tests. Mother also completed her Evidence Code section 730 evaluation; the evaluator recommended that Z. be returned to her care. Z.'s counsel agreed with the request. Mother provided documentation in support of the request, including letters from her therapist and drug program supervisor, a certificate showing she completed eight parenting classes, and the Evidence Code section 730 evaluation report. The court granted the petition after holding a hearing on March 12, 2021.

On July 12, 2021, the court held a review hearing. Over the objections of DCFS and Z.'s counsel, the court found that the conditions justifying jurisdiction no longer existed and terminated jurisdiction over Z. Mother timely appealed the order; that appeal remains pending.

11

In light of these subsequent events, DCFS filed a motion to dismiss the instant appeal as moot. Mother opposed the motion in a written response and again in a "supplemental opposition." We denied the motion.

## DISCUSSION

I.    *Justiciability*

Given the post-appeal developments in this case, and DCFS's contention that mother's challenge to the disposition order is moot, we first consider the justiciability of the appeal. Under the justiciability doctrine, courts generally do not resolve moot questions or abstract propositions, nor do we issue advisory opinions. (*In re L.O.* (2021) 67 Cal.App.5th 227, 237.) A key requirement for justiciability is the ability of the court to provide effective relief—a remedy that can have a tangible, practical effect on the parties' conduct or legal status. (*Ibid.*) "'For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence' or is unchallenged." (*Ibid.*)

There are exceptions to this general rule, however. "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*).)

Here, the juvenile court exercised jurisdiction over Z. under section 300, subdivision (b)(1), meaning it found that Z. "has

12

suffered, or there is a substantial risk that the child will suffer, serious, physical harm or illness, as a result" of mother's substance abuse and mental and emotional problems. (§ 300, subd. (b)(1).) These findings served as the basis for the disposition order, which mother also challenges. Furthermore, the findings could have severe consequences to mother in future dependency proceedings. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716.) We accordingly exercise our discretion to reach the merits of mother's appeal of the jurisdiction order.

We agree with DCFS, however, that mother's challenge to the disposition order is not justiciable. Mother contends the court "erred at disposition by removing Z[.]" from her custody and by failing to consider reasonable alternatives to removal. She asserts that "the removal order should be reversed," and in her request for relief again states that we "should reverse the juvenile court order removing the children [*sic*] from [her] custody."

The order removing Z. from mother's care already has been reversed. Not only did the court reverse the order by granting mother's section 388 petition, it also subsequently terminated jurisdiction with Z. in mother's care. Due to these developments, we would be unable to provide mother with any effective relief even if we were to conclude the court erred at the disposition stage of the proceedings. She already has been awarded the relief she seeks: reunification with Z. We accordingly dismiss mother's challenge to the disposition order as moot.

II.    *Fourth Amendment*

Mother contends DCFS violated the Fourth Amendment by taking Z. into protective custody at the hospital without first obtaining a warrant, because no exigent circumstances were

13

present. Mother acknowledges that her counsel failed to raise this issue before the juvenile court, but urges us to exercise our discretion "to review an otherwise forfeited issue" because counsel for DCFS raised the issue "in an indirect way" and the issue presents a question of law that may be raised for the first instance on appeal. DCFS responds that mother forfeited the issue. We agree with DCFS.

The doctrine of forfeiture prevents a party from seeking reversal on appeal after failing to raise an objection in the lower court. It provides that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) The purpose of this rule, which applies in dependency cases, "is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Ibid.*) Though application of the forfeiture rule is not automatic, "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue." (*Ibid.*)

Mother's counsel did not raise the Fourth Amendment in any way during the detention hearing, when the juvenile court could have addressed mother's concerns, or even at the subsequent adjudication hearing. This silence could not be attributed to lack of notice of the issue; the paperwork supporting the hospital hold was attached to the detention report, and counsel's arguments indicated familiarity with the contents of that report.

14

Moreover, contrary to mother's assertion, counsel for DCFS never raised the issue.[4] Counsel for DCFS stated, "What is also concerning is the way the referral came in. Mother was afraid of the hospital staff, appearing irrational. She was combative. At one point security had to be called into the nursery when we were trying to explain detention to the mother. It appears at this point there are some issues that need to be work [*sic*] out before this newborn can be returned to the mother's care." These remarks in no way suggest a Fourth Amendment violation or preserve the issue for appeal.

The constitutional nature of mother's claim does not excuse the forfeiture. Nor does it render the question an entirely legal one of the sort that may be raised for the first time on appeal. "Social workers constitutionally may remove a child from the custody of a parent without prior judicial authorization if the information they possess at the time of seizure provides reasonable cause to believe that the child is in imminent danger." (*M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 527; see also § 306, subd. (a)(2).) "[D]etermining whether an official had 'reasonable cause to believe exigent circumstances existed in a given situation . . . [is a] "question[ ] of fact . . . ."'" (*Arce v. Children's Hospital Los Angeles* (2012) 211 Cal.App.4th 1455, 1475.) The juvenile court here did not have the opportunity to resolve this important question of fact, and we decline to do so in the first instance.

---

[4] We do not suggest or hold that a party may avoid forfeiture if an opposing party raises the forfeited issue or a related issue. We simply note that the comments made by DCFS counsel do not support mother's assertion that DCFS raised the issue, "albeit in an indirect way."

Mother asserts in reply that DCFS "doesn't want this issue . . . reviewed on appeal because this kind of illegal taking of children in violation of the Fourth and Fourteenth Amendment occurs too often if not routinely." This inappropriate ad hominem attack is not well taken. Of the three cases mother cites, only one, *Rogers v. County of San Joaquin* (9th Cir. 2007) 487 F.3d 1288, actually concluded that a Fourth Amendment violation occurred. The other two cases, *Arce v. Children's Hospital Los Angeles*, *supra*, 211 Cal.App.4th 1455, and *Mabe v. San Bernardino County, Department of Public Social Services* (9th Cir. 2001) 237 F.3d 1101, involved unresolved, unproven allegations. Neither a single case, nor three cases involving different agencies spread over more than a decade, establishes "routine" misconduct or suggests misconduct is likely to recur if forfeiture is not excused here.

III.    *Jurisdiction*

The court sustained allegations that mother's substance abuse and mental and emotional problems placed Z. at risk of serious physical harm. Mother contends the court's jurisdiction findings were not supported by substantial evidence. With respect to the substance abuse allegation, mother argues that there was no evidence she abused substances or connecting her alleged substance abuse to any risk to Z. With respect to the allegation concerning her mental and emotional problems, mother argues that the "record lacks evidence of any specific, defined risk of harm to Z[.] from [mother's] mental illness, depression."

A.    *Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and disposition, we determine

16

if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the providence of the trial court."  [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  [Citations.]  '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."'  [Citation.]"  [Citation.]'"  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

  B. *General Principles*

  Section 300, subdivision (b)(1) authorizes a juvenile court to exercise jurisdiction over a child if it finds that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b)(1).)  "A jurisdictional finding under section 300, subdivision (b)(1), requires [the agency] to demonstrate the following three elements by a preponderance of the evidence:  (1) neglectful conduct, failure, or inability by the

17

parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

"'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) Instead, "'[t]he basic question under section 300 is whether circumstances at the time of the [adjudication] hearing subject the minor to the defined risk of harm.' [Citation.]" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) In evaluating whether a child faces a risk of harm under section 300, the court may consider past events, as "[a] parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) To establish a risk of harm at the time of the adjudication hearing, however, "[t]here must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 136.)

C.     *Substance Abuse*

Mother argues that there was no evidence that she abused any substances, or any link between her alleged substance abuse and a risk of harm to Z. We disagree.

A drug test administered prior to Z.'s birth showed that mother used at least three different drugs while pregnant with Z. Mother admitted using marijuana, though her statements regarding her use varied. She told hospital staff and the responding CSW that she used marijuana "on occasion," and "did not do it all the time because it made her sleepy." Mother also told the CSW she had used marijuana "regularly" prior to learning she was pregnant. Mother later told a different CSW that she consumed marijuana edibles when she was 2-3 months

18

pregnant, to cope with the loss of Z.'s father; in the same interview, however, she stated that she "stopped using edibles when [she] was 8 months pregnant," and also "smoked weed." Despite the positive test results for amphetamines and benzodiazepine, mother consistently told DCFS she never used either drug; she suggested, repeatedly, that the marijuana she purchased may have touched other drugs before she bought it. Mother told Z.'s foster mother, however, that "experimenting with substances during pregnancy was a mistake." And two of the drug tests mother took after Z. was detained were no-shows, which properly may be considered the equivalent of a positive test result. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*).)

Mother does not dispute this evidence establishes drug use.[5] She contends that her drug use did not rise to the level of abuse. She relies on *Drake M.*, *supra*, 211 Cal.App.4th at p. 766, which held that a finding of substance abuse must be based on evidence sufficient to either "show that the parent . . . had been diagnosed as having a current substance abuse problem by a

---

[5] Mother does argue that her two no-show drug tests should not constitute substantial evidence of drug use or abuse because the court had no authority to make her drug test before it exercised jurisdiction over Z. While the juvenile court cannot order or compel a parent to cooperate with DCFS or participate in services prior to the jurisdictional hearing, "[t]hat's not to say there are no consequences for failing to cooperate in the investigation or participate in services. One consequence is that those failures 'can be used later as evidence in a review hearing or a hearing on a [section 300] petition.' [Citation.]" (*In re E.E.* (2020) 49 Cal.App.5th 195, 209.) We decline mother's invitation to "not follow" *In re E.E.*

19

medical professional," or "establish that the parent . . . has a current substance abuse problem as defined in the DSM-IV-TR," a diagnostic manual used by medical professionals.[6]

Even under this definition, which several courts have rejected as too narrow (see, e.g., *Christopher R., supra,* 225 Cal.App.4th at p. 1218; *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726), the record supports a finding of substance abuse. According to the jurisdiction/disposition report, mother's hospital discharge summary stated that she "was diagnosed with drug abuse during pregnancy."[7]  Mother's pregnancy ended immediately prior to Z.'s detention and two months before the

---

[6]      "The full definition of 'substance abuse' found in the DSM-IV-TR describes the condition as '[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period:  [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance abuse; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[;¶] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights)." (*In re Drake M., supra,* 211 Cal.App.4th at p. 766.)

[7]      The discharge report appears to be included in the appellate record but is not legible.

adjudication hearing, and mother had two no-show tests during this short period. The court properly could conclude from this evidence that mother had a substance abuse problem at the time of the hearing.

In addition to the explicit diagnosis of drug abuse during pregnancy, which neither mother nor DCFS mentions, the record contains substantial evidence from which the court could conclude mother experienced "life-impacting effects of drug use" and therefore engaged in substance abuse. (*In re Rebecca C.*, *supra*, 228 Cal.App.4th at p. 726.) Mother admitted that she turned to drugs to cope during difficult times in her life, including the death of Z.'s father, her period of homelessness, and while she was under the care of maternal great-cousin T. as a minor. Mother purchased substances from "random people on the street," did not know what they contained, and "experiment[ed]" despite knowing she was pregnant with Z. (See *Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1218-1219 [mother's cocaine use during the final stage of pregnancy and admitted drug use in the past supported finding of substance abuse].) She acted so erratically and aggressively with hospital staff that they ordered drug testing for her, indicating that her substance use resulted in social or interpersonal problems. T., who had known mother since birth, also suggested that she would have concerns for mother's ability to care for Z. if mother did not test clean for a significant amount of time.

Mother also argues that the record is devoid of evidence that her substance abuse placed Z. at risk of harm. With respect to a child of "tender years" like Z., who was less than two months old at the time of the adjudication hearing, a "finding of substance abuse is prima facie evidence of the inability of a

21

parent or guardian to provide regular care resulting in a substantial risk of harm." (*Drake M.*, *supra*, 211 Cal.App.4th at p. 767; accord, *Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.) The juvenile court specifically cited "the tender age of the newborn child" when making its jurisdiction findings. Mother does not address the import of this factor, particularly where she would be Z.'s sole caretaker if the court released Z. to her. "Indeed, her use of [marijuana and other substances] during the last months of her pregnancy confirmed her poor judgment and willingness to endanger her child[ ]'s safety due to substance abuse." (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.) The court's finding that mother's substance abuse placed Z. at risk of harm was supported by substantial evidence.

D.      *Mental and Emotional Problems*

Because we find that there was sufficient evidence to support jurisdiction based on mother's substance abuse, we need not address mother's contention that the court's findings regarding her mental and emotional problems were not supported by substantial evidence. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Nevertheless, we conclude that substantial evidence supported this basis for jurisdiction as well.

22

DCFS alleged Z. was at risk of harm due to mother's "mental and emotional problems including aggression and a diagnosis of Depression which renders the mother incapable of providing regular care and appropriate supervision." Mother asserts that her depressive episodes were acute and related to the deaths of loved ones, including her mother and boyfriend, and did not pose any threat to Z. Mother entirely ignores the finding of aggression, which was alleged in the petition and amply supported by the record.

Mother acknowledged that she engaged in "aggressive behaviors due to not knowing how to cope with life circumstances." Although she is to be commended for her efforts to "manage [her] emotions better," mother plainly struggled with doing so. She behaved aggressively toward hospital staff and repeatedly threatened to leave the hospital with Z. because she "want[ed] to be freed." Mother became angry when hospital staff woke her up to check on her and Z., whom she failed to hold, feed, or change, or visit in the nursery after she was detained. Mother also became aggressive with the CSW, repeatedly insulting her and raising her voice to the point of disrupting infants in the nursery. Maternal great-cousin T. reported that mother had suffered from aggression for a long time; she described mother as "very aggressive" and "short-fused," with "a very short patience [*sic*]" and a disinclination to follow even simple house rules.

"The existence of a mental illness is not itself a justification for exercising dependency jurisdiction over a child." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 563.) However, the court reasonably concluded that mother's lack of "emotional control" was likely to present a risk to Z., for whom mother was "going to be caring . . . under difficult situations." Mother's longstanding

23

difficulties regulating her behavior, while understandable in light of her difficult childhood, posed a danger to Z. Even when Z. was newly born, mother was unable to meet Z.'s most basic needs. Multiple nurses had to ask mother to calm down, and, when she would not, had to call security to escort her from the scene. A reasonable trier of fact could conclude that Z. would be at risk in mother's care due to mother's aggressive behavior.

## DISPOSITION

We dismiss mother's challenges to the court's compliance with the Indian Child Welfare Act and disposition order. We affirm the remainder of the court's orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.

24