Filed 12/14/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ADRIAN L., a Person Coming Under the Juvenile Court Law. | B318627 (Los Angeles County Super. Ct. No. 19CCJP01922) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SUSIE R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Judge Pro Tempore.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

––––––––––––––––––

Susie R. (Mother) appeals from the juvenile court order terminating her parental rights to her child Adrian L. pursuant to Welfare and Institutions Code section 366.26.[1]  She contends the Los Angeles County Department of Children and Family Services (DCFS) did not comply with its duty under section 224.2, subdivision (b) to inquire of extended family members, including maternal grandmother, paternal grandmother, and paternal aunt, regarding Adrian's potential status as an Indian child as defined in the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).  Thus, she argues, DCFS did not "adequately

––––––––––––––––––

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

Mother's notice of appeal and the introduction of her opening brief state she also appeals the juvenile court's order denying her section 388 petition.  Because Mother does not provide any argument relating to this order, however, the issue has been waived on appeal.  (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["Appellate briefs must provide argument and legal authority for the positions taken.  'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["We are not bound to develop appellants' arguments for them.  [Citation.]  The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived"].)

investigate[ ]" Adrian's Indian status, and we should reverse the juvenile court's order terminating Mother's parental rights and remand the matter for ICWA compliance.

DCFS argues we should hold that any error in failing to interview extended family members was harmless because the record does not demonstrate that any such inquiry would bear meaningfully on the question of whether Adrian is an Indian child.[2]

In light of the facts in the record, which include the parents' denials of Indian affiliation, as well as extensive efforts by Mother, Mother's counsel, extended family members, and minor's counsel, to have Adrian placed with the extended family members, we conclude additional inquiry would not have yielded information that was likely to bear meaningfully on the question of whether Adrian is an Indian child. Accordingly, any failure to inquire of extended family members was harmless. We thus affirm.

---

[2] DCFS also argues substantial evidence supports the juvenile court's determination that ICWA did not apply to Adrian. Because we affirm on the basis that any ICWA inquiry error was harmless, we do not consider this alternative argument.

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## A.     Petition and Non-detention

In February 2019, Mother, newborn Adrian, and maternal grandmother resided together in Duarte, California. Adrian L. Sr. (Father), lived in Las Vegas, Nevada.

On February 13, 2019, DCFS received a referral relating to Adrian. The referral concerned Mother's history of substance abuse and her failure to reunify with Adrian's three older half-siblings, who were dependents of the juvenile court and receiving permanent placement services. On March 15, 2019, a foster care provider finalized adoption of these siblings.

On March 25, 2019, DCFS filed a petition on behalf of Adrian pursuant to section 300, subdivisions (b)(1) and (j).

At the March 26, 2019, detention hearing, the juvenile court found a prima facie case that Adrian was a child described under section 300 and, finding services were available to prevent detention, ordered Adrian released to Mother under DCFS supervision. The juvenile court also found Adrian Sr. to be the presumed father.

## B.     Jurisdiction and Disposition

On May 15, 2019, the juvenile court held a combined jurisdictional and dispositional hearing. At the hearing, the juvenile court sustained an amended count under section 300, subdivision (b)(1), relating to Mother's substance abuse. It

---

[3] This appeal turns on issues relating to the sufficiency of DCFS's ICWA inquiry. Thus, we provide only a brief summary of the dependency proceedings and focus on facts relevant to the ICWA inquiry.

ordered Adrian removed from Father's custody and released to Mother with the provision of family maintenance services.[4]

Through September 2020, Mother and Adrian moved between maternal grandmother's home and inpatient substance abuse programs or sober living residences.

## C.  Proceedings Following Subsequent and Supplemental Petitions and Detention

Adrian remained with Mother until October 2, 2020, when the juvenile court granted DCFS's request for an expedited removal order pursuant to section 340, subdivision (b).  DCFS filed a subsequent petition alleging Mother had mental and emotional problems, including suicidal ideation, as well as a supplemental petition seeking foster placement due to Mother testing positive for amphetamine and methamphetamine.

On October 9, 2020, the juvenile court ordered Adrian detained from Mother.  Additionally, it ordered DCFS to assess the maternal grandmother, paternal grandmother, and paternal aunt for placement.[5]  In the meantime, DCFS placed Adrian with a foster mother.

On January 20, 2021, Mother entered a no contest plea, and the juvenile court sustained allegations of suicidal ideation

---

[4] Father did not receive family reunification services because he was in jail at the time.  Father, who died during the pendency of the dependency proceedings, is not a party to this appeal.

[5] In January 2021, DCFS reported the paternal grandmother and paternal aunt were not interested in caring for Adrian because they were currently caring for Father's other children.

and recent substance abuse. The juvenile court ordered DCFS to assess maternal grandmother for placement. The following day, Mother reported to the social worker that she no longer wanted to participate in a particular outpatient substance abuse program, and she wanted a family member to adopt Adrian.

In an April 7, 2021, last minute information (LMI), DCFS reported that Father died after he had been stabbed multiple times at the maternal grandmother's home in February 2021. Mother was arrested for his homicide.

In the LMI, DCFS also reported its findings relating to relative placement. DCFS recommended against placing Adrian with maternal grandmother because she had allowed Father to have unmonitored contact with Adrian in violation of court orders and was not forthcoming about Father's whereabouts. Also, the maternal uncles who lived in maternal grandmother's home hosted parties, which had the effect of triggering Mother to relapse into drug use. Further, maternal grandmother worked full time, and thus maternal uncles would have had to care for Adrian. The social worker noted she had observed one of the maternal uncles "high" and smelling of marijuana.

On April 7, 2021, the juvenile court ordered DCFS to interview Mother, maternal grandmother, and maternal uncle about Adrian's placement and to assess placement of Adrian "with any appropriate relative." It also ordered monitored visitation for maternal grandmother and a maternal uncle.

In a May 18, 2021, LMI, DCFS reported its most recent findings relating to relative placement. Mother wanted Adrian placed with the same legal guardian with whom Adrian's two minor half-siblings were placed. Maternal grandmother and maternal uncle renewed their desire to have Adrian placed with

6

them.  Also, a paternal aunt, Veronica G. (Veronica), who lived with paternal grandparents, had visited Adrian since his birth, and had acted as a monitor for Adrian's visits with Father, sought to have Adrian placed with her.[6]  DCFS also reported that another paternal aunt, Claudia M. (Claudia), expressed interest in caring for Adrian, whom she had met for the first time at Father's funeral.

In July 2021, DCFS approved Veronica for placement. Because she worked three jobs and had other children in the home during the summer, Veronica was unable to commit to taking Adrian to continued developmental assistance services and could not immediately provide a date on which she would begin to host him overnight.  DCFS reported it would conduct a further assessment relating to placement with Veronica.  The foster mother continued to express interest in having Adrian placed with her.

At the August 5, 2021, six-month review hearing, the juvenile court found Mother's progress had not been substantial, terminated family reunification services, and scheduled a section 366.26 permanency planning hearing.

On August 10, 2021, Mother filed a notice of intent to file a writ petition contesting the juvenile court's order scheduling a section 366.26 hearing.  Mother did not file the writ petition, however, and it was deemed non-operative.

On September 10, 2021, minor's counsel filed a walk-on request with the juvenile court as well as a section 388 petition. Minor's counsel stated, "DCFS has stopped overnight visits with

---

[6] Veronica had a criminal history, but she obtained an exemption that would allow her to have Adrian placed with her.

7

the paternal aunt [Veronica], who I understood was moving toward placement with the minor.  I was not provided with an explanation and ha[ve] since been in contact with the aunt, who states she was not given an explanation and has been working toward placement with the minor . . . .  The child is in foster care and is in need of a permanent plan that includes a relative before the next court date if she is to be considered."  Minor's counsel argued, "[s]ection 361.3 provides that preferential consideration be given to relative placements."  Minor's counsel requested that the juvenile court, "[r]einstate overnight visits and placement assessment for the paternal aunt."

On October 29, 2021, Veronica sent a letter to the juvenile court, challenging DCFS's characterization of her lack of ability and interest in providing a home to Adrian.

In a report filed November 2, 2021, DCFS repeated its reasons for concluding that maternal grandmother's home was not a good option for placement.  As to Veronica, DCFS reported she would request time off from work to ensure Adrian's needs were met.  However, she was unwilling to take Adrian to visit maternal relatives or Mother in jail.  DCFS concluded that, notwithstanding Veronica's current commitment to provide all the required care for Adrian, Adrian, who had special developmental needs, "would not receive the same committed and detailed care" in Veronica's home as he did with the foster mother with whom he had lived since October 2020.  Moreover, Adrian's doctor reported concern that Adrian would "regress" if removed from the caregiver and placed with Veronica.  Thus, DCFS recommended Adrian remain placed with the foster mother.

On November 4, 2021, minor's counsel withdrew the section 388 petition.

On November 24, 2021, Mother's counsel filed a section 388 petition, noting her successful completion of multiple programs. She requested that Adrian reside with the maternal grandmother while Mother remained incarcerated or, in the alternative, that Mother's family reunification services be reinstated.

On November 29, 2021, the parties appeared before the juvenile court for the section 366.26 hearing. At that time, the juvenile court denied Mother's section 388 petition without a hearing on the basis that Mother did not present new evidence or changed circumstances. The juvenile court also denied a pro se section 388 petition filed by Claudia, who continued to request that Adrian be placed with her. The juvenile court continued the section 366.26 hearing to February 7, 2022.

On February 7, 2022, the juvenile court found Adrian was adoptable and no exception to termination of parental rights applied and terminated parental rights to Adrian.

## D.     ICWA Proceedings

On March 25, 2019, DCFS filed an Indian Child Inquiry Attachment form with the original section 300 petition. DCFS reported it had inquired of Mother as to any possible Indian ancestry on February 19, 2019, and Mother denied any such ancestry.

On March 26, 2019, Mother denied Indian ancestry on her parental notification of Indian status (ICWA-020) form.[7] At the

---

[7] The ICWA-020 form advises parents, "If you get new information that would change your answers, you must let your attorney, all the attorneys on the case, and the social worker . . . know immediately and an updated form must be filed with the court."

detention hearing that day, the juvenile court asked Mother whether Father had any Indian heritage. Mother responded, "No." The juvenile court found no reason to know ICWA applied as to Mother and deferred the determination of ICWA status for Father's appearance.

On October 9, 2020, Father's counsel executed an ICWA-020 form on Father's behalf. Reflected on that form is Father's denial that Adrian had Indian ancestry. On the same day, Father and his counsel were present in court. The juvenile court reviewed Father's ICWA-020 form out loud, noting Father indicated "no Indian ancestry as far as he knows." Neither Father nor his counsel corrected the juvenile court.

On January 20, 2021, the court ordered a case plan for each parent, which included a checked box indicating that the juvenile court found ICWA did not apply to Mother or to Father.[8]

On November 29, 2021, the juvenile court found ICWA did not apply to the case.

On February 14, 2022, Mother filed a timely notice of appeal.

## DISCUSSION

The juvenile court and DCFS "have an affirmative and continuing duty to inquire whether a child for whom a [section 300] petition . . . has been filed, is or may be an Indian child."[9]

---

[8] Father's death occurred in February 2021.

[9] An "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized

10

(§ 224.2, subd. (a).)  Additionally, section 224.2, subdivision (b) states, that "[i]f a child is placed into the temporary custody of a county welfare agency pursuant to [s]ection 306 . . . the county welfare department . . . has a duty to inquire whether that child is an Indian child.  Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."[10]

Mother argues that DCFS breached its duty of inquiry under section 224.2, subdivision (b), to inquire of extended family members "like the maternal grandmother, paternal grandmother, and paternal aunt whether Adrian might have Indian ancestry." She contends that the failure to conduct this "first-step inquiry" was prejudicial.

We disagree.  As our prior decisions make clear, DCFS's failure to inquire of extended family members does not result in automatic reversal.  (See *In re A.C.* (2022) 75 Cal.App.5th 1009;

---

tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions], subd. (b) [expanding the age range stated in the federal definition to include persons over 18, but under 21, years of age].)

[10] Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent."  (25 U.S.C. § 1903(2).)

11

*In re S.S.* (2022) 75 Cal.App.5th 575; *In re Darian R.* (2022) 75 Cal.App.5th 502.) Instead, we must examine the record and reverse or remand only if that review shows prejudice because there was "information that was likely to bear meaningfully upon whether the child is an Indian child." (*In re Darian R.*, *supra*, at p. 509, quoting *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744.)

The appellate record does not demonstrate that inquiring of maternal grandmother, paternal grandmother, or paternal aunt would have yielded information likely to bear meaningfully on the court's ICWA determination.

Mother had at least three opportunities to advise the juvenile court that Adrian was possibly an Indian child. First, DCFS interviewed Mother pre-petition about Adrian's possible Indian heritage. Second, Mother also filled out an ICWA-020 form prior to her first court appearance. Although the only box on the form that Mother checked stated, "I have no Indian ancestry as far as I know," she opted not to check other boxes on the form which inquired (1) if she was a member or eligible for membership in any Indian tribe, (2) if Adrian was a member or eligible for membership in any Indian tribe, and (3) if Mother's parents, grandparents or other lineal ancestors is or were members of any Indian tribe.[11]

---

[11] We emphasize this because the test for whether ICWA applies does not turn on whether a child has "Indian ancestry," although that is often used as a shorthand reference for the subject of factual inquiries that may bear on the ultimate question whether a child is or may be an "Indian child." Our colleagues in Division Three recently made the point succinctly in

12

Third, the juvenile court asked Mother whether Father had any Indian ancestry. In each instance, Mother denied any Indian affiliation.

On the day of his first appearance, Father also filed an ICWA-020 form in which he denied any Indian ancestry. When the juvenile court noted Father's denial in court, Father and his counsel did not correct the juvenile court.

The existence of parental denials of Indian ancestry, including denials on Judicial Council forms, does not, standing alone, establish a lack of prejudice. We consider such denials along with the rest of the record to determine if the failure to

*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1009 ("it is important to note that 'ICWA does not apply simply based on a child or parent's Indian ancestry.' [Citation.] Instead, the 'definition of "Indian child" ' is 'based on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship' "). The point is nuanced but particularly salient in light of the current equal protection challenge to ICWA pending before the United States Supreme Court, in which the parties are sharply divided on the question of whether ICWA makes impermissible racial classifications or permissible distinctions based on political affiliations. (See *Brackeen v. Haaland* (5th Cir. 2021) 994 F.3d 249, cert. granted Feb. 28, 2022, No. 21-376, ___U.S. ___ [142 S.Ct. 1205, 212 L.Ed.2d 215]; compare brief for petitioner State of Texas (May 26, 2022) 2022 WL 1785628 at p. *19 ["ICWA violates the Constitution's equal-protection guarantee by categorizing children based on genetics and ancestry"] with Merits Brief for the Federal Parties (Aug. 1, 2022) 2022 WL 3449156 at p. *61 ["whether a child is an 'Indian child' under ICWA[ citation], turns on the child's connection to an Indian tribe—the paradigmatic example of a 'political rather than racial' classification"].)

13

make ICWA inquiries of other family members deprived the juvenile court of information "likely to bear meaningfully upon whether the child is an Indian child." (*In re Darian R.*, *supra*, 75 Cal.App.5th at p. 509.)

Here, the record does not disclose a reason to conclude that inquiring of maternal grandmother, paternal grandmother, or paternal aunt would have yielded different information. Mother and Father were close to their respective families. Mother and (to a lesser extent) Father resided with maternal grandmother and maternal uncles at various times throughout the proceedings. Father maintained a relationship with his sister, Veronica, who also lived with paternal grandparents as well as Father's two other children. Thus, it is unlikely maternal grandmother, paternal grandmother, or paternal aunt had knowledge of Adrian's possible tribal affiliation superior to Mother's and Father's disclaimer of any such ancestry. (Cf. *In re A.C.*, *supra*, 75 Cal.App.5th at p. 1016 [where Mother herself had been a product of foster care and "may not have known her cultural heritage"]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 554 [remanding for ICWA inquiry in matter where appealing parent was adopted and estranged from her parents].)

Further, as this court observed in *In re S.S.*, *supra*, 75 Cal.App.5th 575, because preference is given to placing an Indian child with extended family (25 U.S.C. § 1915(a) & (b)), there is a strong incentive to bring to the juvenile court's attention facts suggesting that a child is an Indian child. (*In re S.S.*, *supra*, at p. 582.) Here, Mother and her counsel repeatedly (and unsuccessfully) urged the juvenile court to place Adrian with maternal grandmother. Further, paternal aunt, Veronica (with whom paternal grandparents lived), engaged in significant efforts

14

to have Adrian placed with her.  Minor's counsel, to some extent, aided Veronica in this endeavor, arguing to the juvenile court that the dependency statutes favor placement with relatives.  Yet neither Mother, her attorney,[12] maternal grandmother, Veronica, or minor's counsel indicated that Adrian may be an Indian child. That they did not so do implies the extended family members are unaware of facts that would bear meaningfully upon the issue.

Although *In re S.S.*, *supra*, 75 Cal.App.5th at page 582 focused on the incentive to bring forth information regarding a child's potential status as an Indian child based on the placement preference for extended family members, there are other incentives for a parent and the parent's relatives to bring ICWA information to the attention of the court that also warrant consideration in connection with our harmless error assessment.

Of particular relevance here is the fact that "[i]n cases in which the ICWA applies, the juvenile court cannot order that the Indian child be placed in foster care unless it finds by clear and convincing evidence that the evidence, including expert testimony, establishes that continued custody by the parent or

---

[12] Los Angeles County local court rule 7.17 requires parents' attorneys to ask their clients whether they have a reason to believe their child is an Indian child and to make every effort to assist in confirming the child's Indian status.  (Super. Ct. L.A. County, Local Rules, rule 7.17(a), (e)(3).)  Moreover, the rule requires parents' counsel to "have a complete familiarity with the facts of the case by reviewing the court file."  (*Id*., rule 7.17(e)(5).) Thus, we may reasonably infer that Mother's attorney would have been aware of the placement preferences for Indian children and motivated to assist in Mother's efforts to have Adrian placed with relatives.  This lends further support to our conclusion that Mother fails to show prejudice.

15

Indian custodian is likely to cause the child serious emotional or physical damage [25 U.S.C. § 1912(e)]. This finding must be made at the disposition hearing." (Seiser & Kumli, 1 Cal. Juvenile Courts Practice & Procedure (2022) § 2.125; see *In re Austin J.* (2020) 47 Cal.App.5th 870, 882.) Thus, in 2021, when Mother was facing the prospect that the court would consider removing Adrian from her care at the disposition hearing, she would have had the benefit of this higher standard of proof if there were "reason to know" Adrian was an Indian child.[13]

Additionally, when termination of parental rights is sought, the evidence, including expert testimony, must establish beyond a reasonable doubt that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. (25 U.S.C. § 1912(f); § 366.26, subd. (c)(2)(B)(ii).) California requires this finding supporting the termination of parental rights be made "at the hearing terminating parental rights." (§ 366.26, subd. (c)(2)(B)(ii).) This enhanced burden of proof that DCFS would have faced if there had been reason to know Adrian was an Indian child, provided additional incentive for Mother and her family members to bring forward information bearing on whether Adrian was an Indian child.

In sum, our review of the record as a whole does not disclose that unquestioned extended family members were likely to have had information that would have borne meaningfully on

---

[13] "When there is reason to know that the child is an Indian child, the court shall treat the child as an Indian child unless and until the court determines . . . that the child does not meet the definition of an Indian child as used in [s]ection 224.1 and the federal [ICWA]." (§ 224.2, subd. (i)(1).)

16

whether Adrian is an Indian child.  Accordingly, any ICWA inquiry error under section 224.2, subdivision (b) was harmless.

## DISPOSITION

The juvenile court's order is affirmed.

CERTIFIED FOR PUBLICATION

KELLEY, J.*

We concur:

CHANEY, J.

BENDIX, Acting P. J.

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

KELLEY, J., Concurring.

I concur in the majority opinion which concludes that any Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) inquiry error in this case is harmless because it did not prejudice the juvenile court's ultimate finding that ICWA did not apply. I write separately because I conclude that DCFS did not in fact fail to make statutorily required ICWA inquiries.

The foundation of Susie R.'s (Mother) appeal is her contention that the Los Angeles County Department of Children and Family Services (DCFS) was required to interview extended family members about Adrian L.'s potential Indian status under Welfare and Institutions Code[1] section 224.2, subdivision (b). The subdivision states, "If a child is placed into temporary custody of a county welfare department pursuant to [s]ection 306 . . . , the county welfare department . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking . . . extended family members. . . ." (*Ibid.*) Mother claims this error, which in her view occurred at the outset of the case in 2019, and thereafter remained uncured, undermined the juvenile court's subsequent decisions predicated on a finding that ICWA did not apply, including the ultimate order issued on February 7, 2022, terminating parental rights.

Mother's contention that DCFS violated section 224.2, subdivision (b) is based on a reading of that provision that is inconsistent with the plain language of the text. It also conflicts with the Legislature's express rejection of language that would

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

have supported Mother's contention that DCFS had a duty to ask extended family members about Indian ancestry under the circumstances present in this case. Finally, Mother's claim of error is inconsistent with the federal ICWA guidance upon which our Legislature modeled the narrower ICWA inquiry duty it created in section 224.2, subdivision (b).[2]

To begin the analysis, it is helpful to emphasize a few aspects of the procedural history of this case. During DCFS's initial investigation, it did not remove Adrian from his parents. Nor did it seek to detain him when it filed the original section 300 petition. The juvenile court conducted a detention hearing on March 26, 2019, and did not detain him from Mother at that time. The court took jurisdiction over the child based on Mother's waiver at a later hearing held on May 15, 2019. Yet, throughout these early proceedings in the juvenile court, and then for another year thereafter, Adrian remained in Mother's custody.

On October 2, 2020, DCFS sought an expedited ruling on its application for an order authorizing removal of Adrian pursuant to the procedures for obtaining a protective custody warrant in section 340, subdivision (b).[3] The juvenile court ultimately issued the requested protective custody warrant.

---

[2] Mother and DCFS have submitted supplemental letter briefs addressing the statutory construction issues in this case in response to our invitation to do so. Both Mother and DCFS state section 224.2, subdivision (b) requires DCFS to ask extended family members about a child's Indian status no matter how the child came into DCFS's temporary custody.

[3] Section 340, subdivisions (a) and (b) permit the juvenile court to issue a protective custody warrant as follows:

Why do these facts matter in resolving the ICWA inquiry question in this case? They matter because the statute we are asked to apply very clearly says that they matter.

## A. Under the Plain Language of Section 224.2, Subdivision (b), There Was No Requirement to Question Extended Family Members

The analysis begins with the statutory language. Section 224.2, subdivision (b) provides as follows: *"If a child is placed into the temporary custody of a county welfare department pursuant to [s]ection 306 . . . ,* the county welfare department . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian

---

"(a) Whenever a petition has been filed in the juvenile court alleging that a minor comes within [s]ection 300 and praying for a hearing on that petition, or whenever any subsequent petition has been filed praying for a hearing in the matter of the minor and it appears to the court that the circumstances of his or her home environment may endanger the health, person, or welfare of the minor, or whenever a dependent minor has run away from his or her court-ordered placement, a protective custody warrant may be issued immediately for the minor." "(b) A protective custody warrant may be issued without filing a petition under [s]ection 300 if the court finds probable cause to support all of the following: [¶] (1) The child is a person described in [s]ection 300. [¶] (2) There is a substantial danger to the safety or to the physical or emotional health of the child. [¶] (3) There are no reasonable means to protect the child's safety or physical health without removal."

3

child and where the child, the parents, or Indian custodian is domiciled." (Italics added.)

Section 306 provides in relevant part: "(a) Any social worker in a county welfare department, . . . while acting within the scope of his or her regular duties under the direction of the juvenile court and pursuant to subdivision (b) of [s]ection 272, may do all of the following: [¶] (1) Receive and maintain, pending investigation, temporary custody of a child who is described in [s]ection 300, and who has been delivered by a peace officer.[4] [¶] (2) Take into and maintain temporary custody of, without a warrant, a child who has been declared a dependent child of the juvenile court under [s]ection 300 or who the social worker has reasonable cause to believe is a person described in subdivision (b) or (g) of [s]ection 300, and the social worker has reasonable cause to believe that the child has an immediate need for medical care or is in immediate danger of physical or sexual abuse or the physical environment poses an immediate threat to the child's health or safety." As caselaw recognizes, "[s]ection 306, subdivision (a)(2) empowers a social worker to take a child into temporary custody under certain circumstances, without a warrant, if the child is in immediate danger." (*M.L. v. Superior Court* (2009) 172 Cal.App.4th 520, 527.)

Despite the large number of recent appeals based on DCFS's failure to make inquiries of "extended family members,"[5]

---

[4] Section 305 also permits a peace officer to take temporary custody of a child without a warrant in certain circumstances.

[5] *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1001 observed that in a 12-month period, at least 100 cases have been remanded for such further inquiry after termination of parental

4

no case appears to have confronted the question of why the prefatory clause in section 224.2, subdivision (b) should be interpreted as meaning something other than what it plainly says—that the inquiry obligation expressed in this subdivision is triggered when the child is "placed into the temporary custody of a county welfare department pursuant to [s]ection 306." (*Ibid*.)

A fundamental tenet of statutory construction is that we begin by examining the words of the statute. "[T]he language used in a statute or constitutional provision should be given its ordinary meaning, and '[i]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' [Citation.] To that end, we generally must 'accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and have warned that '[a] construction making some words surplusage is to be avoided.' [Citation]." (*People v. Valencia* (2017) 3 Cal.5th 347, 357.) " ' " 'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' " ' " (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673.) These principles fully apply in dependency cases. " ' "[I]f the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs." '

---

rights. This does not include the cases where the juvenile court orders were affirmed because the initial inquiry error was found not to be prejudicial.

[Citations]." (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 822 (*Melissa R.*).)

Accordingly, the initial question in this case is: Was Adrian "placed into the temporary custody [of DCFS] pursuant to [s]ection 306" at the outset of the juvenile court proceeding? Clearly, he was not. He was not removed from Mother at all prior to, or in connection with, the filing of the original section 300 petition in March 2019. He remained in her care for more than 17 months thereafter. Thus, the specific ICWA inquiry prescribed by section 224.2, subdivision (b) was not implicated at the outset of this case.[6]

But what about later when DCFS sought to remove Adrian from Mother's custody in October 2020? Was the duty to question

_____

[6] Of course, this does not mean that there was no duty of ICWA inquiry. In fact, two provisions applied. First, the general duty of inquiry specified in section 224.2, subdivision (a) was fully applicable. That subdivision states, "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child for whom a petition under [s]ection 300, 601, or 602 may be or has been filed, is or may be an Indian child. The duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (*Ibid*.) Significantly, this provision omits any mention of a specific obligation to ask extended family members about ICWA, and Mother does not assert there was a failure to undertake this general inquiry under section 224.2, subdivision (a). Second, section 224.2, subdivision (c) requires specific ICWA inquiries of the "parties" and "participants" at the initial dependency hearings. Again, Mother does not contend the juvenile court or DCFS failed to conduct these inquiries.

"extended family members" described in section 224, subdivision (b) triggered then? The answer also appears to be "no."

There can be no dispute that Adrian was not placed into DCFS's temporary custody "pursuant to section 306" in October 2020. Instead, DCFS acted under an entirely different procedure that authorizes the juvenile court to issue protective custody warrants—namely, the warrant procedure pursuant to section 340, subdivision (b). Based upon a showing that Mother had relapsed into methamphetamine use and demonstrated mental instability in the form of suicidal thoughts, DCFS obtained a court order that authorized removal of Adrian from Mother's custody. Section 306 played no role in this removal.

Placing a child into "temporary custody of a county welfare department pursuant to [section] 306" is fundamentally different from taking a child into "protective custody" under section 340. Beyond the obvious feature that one process requires a court order and the other does not, these provisions are found in entirely different articles of the Juvenile law.[7] The two provisions also have different standards that must be met to justify removal. Section 306 requires "imminent physical damage or harm" before a child may be removed without a warrant (*id.*, subd. (c)), but section 340 does not have such a strict standard (*id.*, subds. (a), (b)). Under section 340, a court may issue a warrant without a prior filing of a section 300 petition where "[t]here is a substantial danger to the safety or to the physical *or*

---

[7] Section 306 is part of article 7 which is entitled "Dependent Children—Temporary Custody and Detention." Section 340 is part of article 8 which is entitled "Dependent Children—Commencement of Proceedings."

7

*emotional health* of the child." (*Id.*, subd. (b)(2), italics added.) It thus requires neither imminent nor physical harm. As discussed, *post,* this difference is significant under federal ICWA law because a removal under section 306 is considered an "emergency removal" under ICWA, but a removal pursuant to an order issued under section 340 is not. This distinction illuminates why the legislative choice to limit the scope of section 224.2, subdivision (b) to situations where a child is placed in temporary custody of a county welfare agency pursuant to section 306 aligns it with federal ICWA guidance.

The limitation expressed in section 224.2, subdivision (b) through the phrase when "a child is placed into the temporary custody . . . pursuant to [s]ection 306" is the kind of express statutory limitation that courts have not hesitated to find "clear and unambiguous, rendering it unnecessary to resort to any extrinsic aids." (*Melissa R.*, *supra*, 207 Cal.App.4th at p. 822.) *Melissa R.* concerned section 361.5, subdivision (b)(10), which permits a court to bypass a parent from reunification services where the parent "had failed to reunify with [a] sibling or half sibling after the sibling or half sibling had been removed from that parent . . . pursuant to [s]ection 361." (§ 361.5, subd. (b)(10); *Melissa R.*, *supra*, at p. 822.) In *Melissa R.*, the sibling with whom the parent had failed to reunify was removed from the parent in Wisconsin, "not 'pursuant to [s]ection 361.'" (*Melissa R.*, *supra*, at p. 822.) The court held that the limitation "pursuant to section 361" was clear and had to be enforced. It thus found section 361.5, subdivision (b)(10) did not apply. (*Melissa R.*, *supra*, at p. 822.) "The plain language of the statute is limited to cases involving the removal of a sibling or half sibling from the parent '*pursuant to [s]ection 361.*' . . . The

8

Legislature did not include any language that would permit the extension of this provision to a circumstance in which a sibling was previously removed pursuant to the dependency law of another jurisdiction, whether or not that law is comparable to section 361." (*Ibid*.) In addition to the clarity of the statutory language being construed in *Melissa R.,* the court also noted that the Legislature "knew how to write in language" that would have given the provision the broader scope that the agency sought to read into it. (*Id*. at p. 823 [examples of the Legislature expanding the scope of a statute to other jurisdictions by using language such as "by any court of competent jurisdiction"], italics omitted.)

The same is true here. First, there are other provisions regarding ICWA inquiry that are not restricted in the same manner as section 224.2, subdivision (b). For example, the general duty of inquiry in section 224.2, subdivision (a) applies to every child "for whom a petition under [s]ection 300, 601, or 602 may be or has been filed." In addition, the court-directed inquiry prescribed in section 224.2, subdivision (c) applies to the "first appearance in court of each party" and requires the court to ask "each participant present" about the child's possible status as an Indian child. That the Legislature wrote these provisions, which address the same subject (ICWA inquiries) as section 224.2, subdivision (b), to apply in all dependency cases underscores that the more limited expression the Legislature chose to use in establishing the duty of initial inquiry in section 224.2, subdivision (b) was a conscious decision.

Second, the Legislature's intention is discernable both from the clear words it chose to include in the statute as well as from a broader formulation it *removed* from an earlier draft as the bill made its way through the legislative process. Section 224.2,

9

subdivision (b) was added by Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (Assembly Bill 3176), which became effective January 1, 2019.  As the legislative history shows, when the language requiring the child welfare agency to "ask[ ] . . . extended family members" about the child's possible status as an Indian child was added to Assembly Bill 3176, the prefatory limitation "when the child is taken into temporary custody pursuant to section 306" was also added.  (Sen. Amend. to Assem. Bill 3176 (2017-2018 Reg. Sess.) June 18, 2018, § 4 (the Senate Amendments).)  More significantly, the version of Assembly Bill 3176 that immediately *preceded* these two changes had provided more broadly that the inquiry duty that the Legislature ultimately set forth in section 224.2, subdivision (b) applied "when a child is taken into temporary custody."  (Assem. Amend. to Assem. Bill 3176 (2017-2018 Reg. Sess.) May 25, 2018, § 4.)

In other words, the Legislature expressly rejected having the inquiry prescribed in section 224.2, subdivision (b) apply in *all* cases when a child is placed into temporary custody and limited such inquiry to cases where a child is placed in temporary custody "pursuant to section 306."  A more clear record of legislative choice is hard to imagine.

**B.    Other Aspects of the Legislative History Support the Conclusion that DCFS Did Not Have an Initial Duty to Inquire of Extended Family Members in This Case Under Section 224.2, Subdivision (b)**

1.    *Assembly Bill 3176 as Introduced*

A number of legislative materials describe Assembly Bill 3176 as intended to "conform [California law] to changes to federal regulations governing [ICWA]."  (Assem. Com. on Human Services Hearing Rep., Apr. 10, 2018, at p. 1 (April 10, 2018,

Report); Assem. Third Reading as amended May 25, 2018, at p. 1; Conc. in Sen. Amends., as amended Aug. 22, 2018, at p. 1.) Quoting the author of the bill, the April 10, 2018, Report stated, "[This bill] simply seeks to change California law to comply with Federal regulations." (*Id*. at p. 9.)  Notably the bill as introduced did not mandate initial ICWA inquiries to include "extended family members."  Rather it took an approach, consistent with the stated purpose of the bill, of tracking provisions added by the 2016 federal ICWA regulations.  (See *id*. at pp. 8-9; 25 C.F.R. § 23.107 [entitled "How should a State court determine if there is reason to know the child is an Indian child"].)

These initial proposed revisions to California law focused on expanding the scope of ICWA inquiry required at juvenile court hearings.  Thus, the bill, as it was introduced on February 16, 2018, proposed to amend section 224.3,[8] subdivisions (a) and (d) to state:  "(a) The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child is an Indian child and shall so inquire on the record at any detention hearing, disposition hearing, review hearing to terminate reunification services, or selection and implementation hearing."  "(d) The court shall ask each participant in an emergency, voluntary, or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry shall be made at the commencement of the proceeding and all responses shall be on the record.  The court

_____

[8] In early versions of Assembly Bill 3176, the provisions addressing ICWA inquiry were contained in section 224.3.  Later the Legislature moved these provisions to section 224.2.

11

shall instruct the parties to inform the court if they subsequently receive information that provides evidence that the child is an Indian child."[9]  (Assem. Bill 3176 (2017-2018 Reg. Sess.) Feb. 16, 2018, § 5.)

In this initial version of Assembly Bill 3176, there was no obligation of initial inquiry of "extended family members."  The only reference to making inquiry of extended family members was found in a provision that required "further inquiry" when there was "reason to know" the child is an Indian child.  (See proposed § 224.3, subd. (c), part of Assem. Bill 3176 (2017-2018 Reg. Sess.) Feb. 16, 2018, § 5; see also former § 224.3, subd. (c) added by Stats. 2006, ch. 838, § 31 and revised by Stats. 2018, ch. 833, § 7, eff. Jan. 1, 2019.)

### 2. *May 25, 2018, Amendments*

On May 25, 2018, the Assembly amended Assembly Bill 3176.  This version proposed adding a provision for an expanded initial ICWA inquiry to what was then section 224.3, subdivision

---

[9] As the Legislative Counsel's Digest explained about the initial version of the bill:  "Under existing law, a court, a county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a child is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceeding if the child is at risk of entering foster care or is in foster care.

"This bill would require those entities to inquire if a child is or may be an Indian child on the record at specified hearings. The bill would declare that the duty to inquire begins at the earliest possible moment and would set forth specific steps a social worker, probation officer, or court is required to take to make that inquiry."  (Amend. in Assembly, Assem. Bill 3176, as introduced Feb. 16, 2018, p. 2.)

12

(a). The amended provision stated: "When a child is taken into temporary custody, the child welfare agency has a duty to determine whether that child is an Indian child as defined by [ICWA]. Inquiry starts by asking the child, the parents, legal guardian, and Indian custodian whether the child is, or may be, an Indian."[10] (Assem. Amend. to Assem. Bill 3176 (2017-2018 Reg. Sess.) May 25, 2018, § 4.)

Two things are notable about this version. First, it applied to children "taken into temporary custody" without any limitation based on how they were taken into temporary custody. Second, it said nothing about asking "extended family members or others with an interest in the child" about whether the child is or may be an Indian child during this initial inquiry. Such inquiry was limited to the "child, the parents, legal guardian and Indian custodian."

3. *June 18, 2018, Senate Amendments to Assembly Bill 3176*

What is now section 224.2, subdivision (b) did not become a part of the bill until a set of amendments was offered in the Senate on June 18, 2018. (Senate Amendments, *supra*, at § 4.) These amendments did broaden the initial ICWA inquiry to

---

[10] As the revised Legislative Counsel's Digest explained regarding the May 25, 2018, version of Assembly Bill 3716: "This bill would provide that when a child is taken into temporary custody the child welfare agency has a duty to determine whether that child is an Indian child, as specified, and would set forth specific steps a social worker, probation officer, or court is further required to take in making an inquiry of a child who is the subject of an Indian child custody proceeding." (Assem. Amend. to Assem. Bill 3176 (2017-2018 Reg. Sess.) May 25, 2018.)

13

include "extended family members," but they also added the limitation that became part of the bill, as it was ultimately passed and signed by the Governor, that this specified inquiry applied only to children "placed into the temporary custody of a county welfare department pursuant to [s]ection 306." (*Ibid*.) There are several reasons to conclude that this was an intentional limitation.

First, the June 18, 2018, Senate Amendments also proposed to amend section 306 (the code provision providing for warrantless temporary custody placements) so that it would cross-reference the inquiry prescribed in section 224.2, subdivision (b). (Senate Amendments, *supra*, § 10 [adding new subdivision (b)].) However, it proposed no similar amendment to section 340, which is the other provision in the Welfare and Institutions Code that addresses the alternative process through which a child may be placed into temporary custody pursuant to a court order.

Second, by restricting an obligation to ask extended family members about a child's possible status as an Indian child to the emergency situations covered by section 306 (authorizing warrantless removals), the Legislature implemented a narrow requirement of specific inquiry that paralleled federal guidelines issued in 2016. (See U.S. Dept. of the Interior, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) p. 28 (BIA Guidelines) <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf> [as of Dec. 12, 2022].)

The Senate Judiciary Committee Report on the bill as it was amended on June 18, 2018, specifically references these BIA Guidelines in commentary about the need for the legislation, and

14

several of the specific provisions added to the bill at this time (including § 224.2, subd. (b)) track specific parts of these guidelines, which makes them particularly relevant to understanding the Legislature's intent. (Sen. Judiciary Com., Rep. on Assem. Bill 3176 as amended June 18, 2018, at pp. 6-7; see Gov. Code, § 9080, subds. (a), (d) [written background material submitted to the committee may form evidence of legislative intent]; *Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98, 107, 113 [" 'Committee materials are properly consulted to understand legislative intent, since it is reasonable to infer the legislators considered explanatory materials and shared the understanding expressed in the materials when voting to enact a statute' "].)[11]

In particular, Guideline C.7 recommends asking extended family about a child's Indian status in "emergency removal" situations.[12] It is entitled "Identifying Indian children in emergency situations" and provides: "It is recommended that the State agency ask the family and extended family whether the child is a Tribal member or whether a parent is a Tribal member

---

[11] The Senate Judiciary Committee Report concerning the June 18, 2018, version of the bill states, "The Bureau of Indian Affairs (BIA) promulgated new regulations that took effect on December 12, 2016. . . . This bill updates various provisions of the Welfare [and] Institutions Code that impact custody and treatment of Indian children in an effort to bring state law into compliance with new regulations that update the federal Indian Child Welfare Act." (Sen. Judiciary Com., Rep. on Assem. Bill 3176 as amended June 18, 2018, at p. 2.)

[12] In its supplemental letter brief DCFS asserts that the BIA Guidelines do not include any provision for interviewing extended family members. That is incorrect.

15

and the child is eligible for membership *as part of the emergency removal and placement process*." (BIA Guidelines at p. 28, italics added.)

Several things are notable about this guidance. First, it only recommends inquiry of extended family "as part of the emergency removal and placement process" and does not suggest that such inquiry is required in any other circumstance. Second it places the responsibility on the state agency and not the court. These two features are significant because there are other specific provisions in the BIA Guidelines that address inquiries that are to be made in all cases, including by the court at the initial hearing, and those guidelines do *not* include any recommendation to ask extended family members about the child's tribal affiliation or eligibility. (BIA Guidelines at pp. 9-10 [describing inquiries state courts are to make of each participant at hearings].) Guideline C.7 thus has specific application to emergency removals prior to court intervention.

The third salient feature of this guidance is that the BIA Guidelines highlight the special concerns that arise when a state official effectuates an emergency removal "without court authorization" due to the existence of "imminent physical damage or harm" to the child. Guideline C.2, which is entitled "Threshold for removal on an emergency basis" provides important context for understanding the scope of the guidance contained in Guideline C.7. It states: "ICWA allows for removal of a child from his or her parents or Indian custodian, as part of an emergency proceeding only if the child faces 'imminent physical damage or harm.' The Department [of the Interior] interprets this standard as mirroring the constitutional standard for removal of *any* child from his or her parents without providing due process. [¶] As a general rule, before any parent may be deprived of the care or custody of their child without their

16

consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be provided. A child may, however, be taken into custody by a State official without court authorization or parental consent only in emergency circumstances. Courts have defined emergency circumstances as 'circumstances in which the child is immediately threatened with harm,' including when there is an immediate threat to the safety of the child, when a young child is left without care or adequate supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence. The same standards and protections apply when an Indian child is involved. And those standards and protections are reflected in section 1922 of ICWA, which addresses emergency proceedings involving Indian children." (BIA Guidelines at pp. 23-24, fns. omitted.)

Thus, the federal guidance for when extended family members should be questioned about a child's Indian status describes precisely the circumstance that the California Legislature targeted for the specific requirement it created in section 224.2, subdivision (b) (i.e., that extended family members are to be asked about a child's potential Indian tribal affiliation when a child is placed into temporary custody of a county welfare agency, without a warrant under § 306).

That the Legislature intended to limit the duty of inquiry to warrantless removals under section 306 in a fashion parallel to the federal scheme is further evidenced by the fact that the Legislature made no amendments to section 340, which authorizes a court order to remove a child without a hearing either before or after a petition under section 300 is filed and is the alternative procedure for removing a child without a hearing.

17

This was not an oversight.[13] As discussed, *ante,* the standards for what must be shown to justify removal of a child under sections 306 and 340 are different and a removal under section 340, with its lower standard, would not be an "emergency removal" under federal law. Recognizing this, the Legislature in section 306, subdivision (c) specified that a removal of an Indian child (or a child there was "reason to know" was an Indian child) "shall be considered an emergency removal under" federal law. (§ 306, subd. (c).) It made no such declaration regarding removals under section 340. In short, in crafting the narrow inquiry duty in section 224.2, subdivision (b) that applies to children removed pursuant to section 306, the Legislature was

---

[13] In her supplemental letter brief, Mother argues that removals under section 340 should be subject to the same inquiry prescribed in section 224.2, subdivision (b) for section 306 removals because the text of section 340 references section 306. This argument lacks merit. The only reference to section 306 in section 340 is "[n]othing in this section is intended to limit a social worker from taking into and maintaining temporary custody of a minor pursuant to paragraph (2) of subdivision (a) of [s]ection 306." (§ 340, subd. (d)(2).) This provision simply underscores that the two provisions are distinct and that the existence of the removal-by-warrant provision in section 340 does not obligate a county welfare agency to use that procedure because the alternative process under section 306 remains available if there is imminent physical harm.

simply creating a duty[14] that tracked federal guidelines for emergency removals.[15]

The immediate inquiry of the child's extended family members that the BIA Guidelines recommend and that section 224.2, subdivision (b) prescribes makes sense given the exigent circumstances inherent in emergency removals, including the

---

[14] Of course, by framing the inquiry described in section 224.2, subdivision (b) as a requirement, California does now make *mandatory* something that federal law only *recommends*.

[15] The California Legislature's intent to model section 224.2, subdivision (b) on the BIA Guidelines also is apparent from other amendments to section 306, which track the BIA Guidelines in other respects concerning emergency removals. For example, the Legislature amended section 306, subdivision (d) to provide that where the social worker "knows or has reason to believe" a child removed pursuant to subdivision (a) (i.e., in a warrantless removal) is an Indian child who "resides or is domiciled within a reservation of an Indian tribe that has exclusive jurisdiction over child custody proceedings, as recognized in [s]ection 1911 of [t]itle 25 of the United States Code," the agency must notify the tribe within the next working day and provide the tribe with all relevant documentation regarding the temporary custody of the child. (*Ibid*.) This provision tracks the language of BIA Guideline C.7. (See BIA Guidelines at p. 28 ["If the State agency believes that the child may be an Indian child, it is recommended that it let the Tribe know the child has been removed on an emergency basis, and begin coordination with the Tribe regarding services and placements" and "[i]f there is still uncertainty regarding who is the Indian child's Tribe, it is recommended that the State agency continue to investigate the applicability of ICWA and document [its] findings"].)

strict time limits for the agency's action.[16]  Moreover, this concern for promptly identifying and then protecting Indian children who may be subject to the exclusive jurisdiction of their tribes, explains why the inquiry the Legislature required of extended relatives in section 224.2, subdivision (b) also includes asking them "where the child, the parents or Indian child is domiciled."  This latter inquiry is critical to the expeditious resolution of the threshold issue of whether a child may be subject to the exclusive jurisdiction of a tribe, which is an issue that the BIA Guidelines emphasize.[17]

The third reason that the Legislature's choice to make the inquiry duty in section 224.2, subdivision (b) a narrow one should be seen as intentional is that by the time of the Senate

---

[16] See section 306, subdivision (d) (requiring if the social worker has reason to know or believe a child resides or is domiciled in a reservation of a tribe with exclusive jurisdiction that notice be given to the tribe the "next working day"); section 306, subdivision (e) (if the social worker is unable to confirm that the child is subject to the exclusive jurisdiction of an Indian tribe, the juvenile court must be advised in the report prepared for the detention hearing).  Also, when these amendments to sections 224.2, subdivision (b) and 306 were proposed, the Legislature also proposed to amend section 309 to require county welfare agencies who receive custody of a child pursuant to section 306 to assess any extended family member who requests emergency placement. (Senate Amendments, *supra*, § 11 [amending § 309].)

[17] "With limited exceptions, ICWA provides for Tribal jurisdiction 'exclusive as to any State' over child-custody proceedings involving an Indian child who resides or is domiciled within the reservation of such Tribe."  (BIA Guidelines at p. 45, citing 25 U.S.C. § 1911(a), fn. omitted.)

Amendments, Assembly Bill 3176 had been amended to include a newly defined duty of "further inquiry" that included "interviewing the parents, Indian custodian, and extended family members" when there is "reason to believe that an Indian child is involved." (See Assem. Bill 3176 (2017-2018 Reg. Sess.) May 25, 2018, § 4 [proposed amended § 224.3, subd. (d)].) If in fact the obligation to make inquiry of extended family members that the Senate Amendments added in section 224.2, subdivision (b) was meant to apply at the outset of every case (instead of being limited to cases where a child is placed into temporary custody pursuant to section 306) then this provision for "further inquiry" would be rendered largely, if not entirely, redundant of an obligation of initial inquiry that already was imposed by another provision of the same bill. This counsels against the broader interpretation of section 224.2, subdivision (b). (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037 [" ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Interpretations that lead to absurd results or render words surplusage are to be avoided" ' "]; see also Code Civ. Proc., § 1858 [in construing a statute, the court is "not to insert what has been omitted[ ] or to omit what has been inserted; and where there are several provisions or particulars," is to adopt a construction "as will give effect to all," if possible].)

Fourth, none of the legislative reports makes mention of an expansion of the duty of initial inquiry to include "extended family members and others who have an interest in the child" in *every* dependency case. (See Assem. Com. on Human Services, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as introduced

Apr. 2, 2018; Assem. Com. on Judiciary, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Apr. 11, 2018; Assem. Com. on Appropriations, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Apr. 11, 2018; Assem. Off. of Research, 3d reading analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended May 25, 2018; Sen. Com. on Judiciary, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended June 18, 2018; Sen. Com. on Appropriations, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended June 18, 2018; Sen. Com. on Appropriations, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended June 18, 2018; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Aug. 17, 2018; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Aug. 22, 2018; Conc. in Sen. Amends., Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Aug. 22, 2018.)  When the Legislature chose to create a duty of inquiry that went beyond federal standards, as it did by adding the requirement of "further inquiry" when there is "reason to believe" a child may be an Indian child, the associated legislative reports highlighted the fact.  (See Assem. Com. on Appropriations, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Apr. 11, 2018, at p. 1 ["In this bill, California has a higher standard for determining if a child *may be* an Indian child and requires that further inquiry must be undertaken for those children"]; Assem. Com. on Judiciary, Analysis of Assem. Bill 3176 (2017-2018 Reg. Sess.) as amended Apr. 11, 2018, at p. 10 [same].)  If the Legislature had intended to exceed federal standards by requiring inquiry of extended family members in every case, then surely it would have been worth at least a

footnote in these reports. But there is no mention of such a dramatic departure from federal law, which underscores that there was no such legislative intent.

4. *Resort to Other Canons of Statutory Construction Is Unnecessary but Nonetheless Supports the Plain-meaning Interpretation*

Construing section 224.2, subdivision (b) more broadly than expressed in the plain language of the statute cannot be justified by contending that the statutory language must be "read in context" (*Titan Electric Corp. v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 188, 203) or read to avoid an interpretation that is "contrary to the legislative intent apparent in the statute" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735), including its remedial nature (*In re Ezequiel G.*, *supra,* 81 Cal.App.5th at p. 1018 (dis. opn. of Lavin, J.)).

Even considering context or the Legislature's general intent (including what some have said is the remedial nature of the statute) does not change the outcome of the analysis of section 224.2, subdivision (b).[18] The "context" that is relevant here is that, in other sections of Assembly Bill 3176, the Legislature expanded the required ICWA inquiries in order to achieve the

---

[18] As the Supreme Court explained, we begin with the principle that when language of a statute is clear " 'there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature.' " (*People v. Valencia, supra*, 3 Cal.5th at p. 357, quoting *Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735; see *Mason v. Department of Real Estate* (2002) 102 Cal.App.4th 1349, 1354 ["While the statute is remedial and must be construed broadly, we can neither disregard its plain language nor add to its terms"].)

23

goal of bringing California's ICWA process into conformity with the 2016 federal regulations.  (See *In re M.W.* (2020) 49 Cal.App.5th 1034, 1043 [describing that § 224.2, subd. (c) was brought into conformity with 25 C.F.R. § 23.107(a) (2020); § 224.2, subd. (d) mirrors 25 C.F.R. § 23.107(c) (2020) and § 224.2, subd. (g) also mirrors 25 C.F.R. § 23.107(b) (2020)].)

There is nothing about construing the plain language of section 224.2, subdivision (b) in the manner described in this opinion that is inconsistent with this legislative context.  Overall, the package of reforms that the Legislature implemented through Assembly Bill 3176 did expand the duties of ICWA inquiry in California compared with the law in effect before the bill was passed.  These amendments generally tracked federal regulations and guidance, but in some very specific instances, which the Legislature highlighted in its reports, they expanded the duty of inquiry.  Choosing to follow the BIA Guidelines and constrain one of the new inquiry provisions to apply only to cases where a child was placed in temporary custody pursuant to section 306 is not inconsistent with this context.

As the bill worked its way through the Legislature, another provision on ICWA inquiry was also narrowed, so section 224.2, subdivision (b)'s limited application cannot be dismissed as anomalous or at odds with a supposed "general purpose" of increasing duties of ICWA inquiry across the board.  Specifically, in the original bill, the inquiry duty that eventually became operative in section 224.2, subdivision (c) required inquiry whether the child is an Indian child "on the record at any detention hearing, disposition hearing, review hearing to terminate reunification services, or selection and implementation hearing." (Assem. Bill 3176 (2017-2018 Reg. Sess.) Feb. 16, 2018,

24

§ 5 [proposed § 224.3, subd. (a)].)  However, as ultimately passed, this obligation to inquire on the record was limited to "the first appearance in court of each party."  (§ 224.2, subd. (c).)  Just as it would make no sense to interpret this provision to apply to all the hearings mentioned in the original draft of Assembly Bill 3176 to implement a perceived "general intent" of the Legislature, it would make no sense to convert the duty of initial ICWA inquiry in section 224.2, subdivision (b) to one that applies to *every* case.

It is also not appropriate to treat the second sentence of section 224.2, subdivision (b),[19] as a generic definition of "inquiry" that the Legislature intended to govern all ICWA inquiries, not just ones referenced in the immediately preceding sentence, referring to section 306.  First, the statute includes a set of generally applicable definitions (§ 224.1), and if the Legislature had intended this sentence to be prescriptive of what must be done in every ICWA "inquiry" one would expect that the term would have been defined as such in the generally applicable definitions.  Second, even if the second sentence of section 224.2, subdivision (b) was intended to be broadly applicable but did not warrant treatment as a formally defined term, it would surely have been included in one of the inquiry provisions that applies in every case (e.g., § 224.2, subd. (a)), rather than placing it immediately following the narrow mandate of the first sentence

---

[19] The sentence provides:  "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, sub. (b).)

of section 224.2, subdivision (b).[20]  Third, Mother's suggestion in her supplemental letter brief that the inquiry prescribed in section 224.2, subdivision (b) applies regardless of the manner in which a child may be removed from her parents because ICWA inquiry must be made as soon as practicable in all " 'Indian child custody proceedings' " as defined in section 224.1, subdivision (d)(1), ignores the language of section 224.2, subdivision (b) as well as the history of its drafting and its alignment with the narrow federal guidance upon which the Legislature modeled it. It also ignores that the Legislature was quite clear when it created inquiry provisions that apply in all cases (see § 224.2, subds. (a) and (c)) but did not do so in the case of section 224.2, subdivision (b).  Fourth, as noted above, when the key sentence in section 224.2, subdivision (b) was broadened (in the June 18, 2018, Senate Amendments), the immediately preceding sentence was narrowed to make the provision applicable only when a child was placed in temporary custody *pursuant to section 306* rather than whenever a child is "placed into temporary custody."[21]

---

[20] As discussed, *post,* the duty of inquiry in section 224.2, subdivision (a) may require questioning extended family members in particular circumstances.  However, that provision, which was in effect prior to the passage of Assembly Bill 3176, had never been interpreted to require questioning extended family members in every case.  If the Legislature had understood or intended it to have that scope, the amendments to section 224.2, subdivisions (b) and (c) would have been unnecessary.

[21] Nor would it be proper to conclude that the Legislature's decision to describe "inquiry" in section 224.2, subdivision (b) as simply errant drafting that can be ignored as an impediment to realizing the Legislature's true intent.  Situating the narrow duty

5.   *The Plain-meaning Construction of the Statute Is Not "Hypertechnical" and Neither Frustrates the Purpose of ICWA nor Leads to "Absurd Results"*

In a supplemental letter brief, DCFS implies that interpreting section 224.2, subdivision (b) as not applying in the instant case because Adrian was not removed pursuant to section 306 would be a "hyper-technical reading" that "does nothing to further the spirit or purpose" of ICWA and "may lead to absurd results." I disagree.

First, describing the language of the statute as "hypertechnical" is an obdurate framing of the statutory construction issue. The limiting phrase "pursuant to section 306" in section 224.2, subdivision (b) is neither complicated nor obscure. It is a common statutory formulation of a type that courts routinely apply just as they are written. (See, e.g., *In re Melissa R.*, *supra*, 207 Cal.App.4th at p. 822 [finding " 'pursuant to [s]ection 361' " not ambiguous], italics omitted.) Second, DCFS does not explicate what the "spirit [and] purpose" of ICWA might be that would be impaired if section 224.2, subdivision (b) is interpreted as the Legislature wrote it. As discussed, the Legislature crafted section 224.2, subdivision (b) in a way that included specific mandated inquiries to be made in the special case of emergency removals and, in doing so, it closely tracked the relevant federal guidance on emergency removals. Unless we are prepared to deem the federal guidelines as in conflict with the "spirit [and] purpose" of ICWA, then this critique of a narrow

of inquiry in this subdivision was a purposeful drafting choice for the reasons discussed *ante*, and we should decline to presume that the Legislature intended this description of "inquiry" to apply more broadly, when the available indicia of its intent point in the opposite direction.

27

interpretation of section 224.2, subdivision (b) must be rejected. Third, construing section 224.2, subdivision (b) to mean exactly what the provision says and in a manner that results in an inquiry duty that maps precisely onto the recommended federal guidance can hardly be "absurd."[22]

6. *The Effect of the California ICWA Compliance Task Force Report*

Several recent opinions construing section 224.2, subdivision (b) broadly draw support for that interpretation from certain statements in the 2017 California ICWA Compliance Task Force, Report to the California Attorney General's Bureau of Children's Justice (Task Force Report) <https://theacademy.sdsu.edu/wp-content/uploads/2015/06/icwa-compliance-task-force-final-report-2017.pdf> (as of Dec. 12, 2022). (See, e.g., *In re J.K.* (2022) 83 Cal.App.5th 498, 506 ["Our Legislature unanimously enacted [§] 224.2, [subd.] (b) after the California ICWA Compliance Task Force . . . issued a report advocating for the new law"]; *In re Rylei S.* (2022) 81 Cal.App.5th 309, 322 ["For this reason [referring to the Task Force Report's statements about parental ICWA inquiry], the Legislature in

---

[22] As another appellate court has observed, it is actually the alternative construction of section 224.2, subdivision (b)—one that mandates the inquiry of a broad range of extended relatives and "others who have an interest in the child" in every case—that can lead to absurd results. (See *In re Ezequiel G., supra*, 81 Cal.App.5th at p. 1006 ["complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family, including first and second cousins, plus every other person who has an interest in the child—is absurd at best and impossible at worst"].)

28

2018 added new [§] 224.2, [subd.] (b) . . . expressly mandating that, from the outset, child protective agencies not limit their investigation of a child's possible Indian status to the child's parents"].)  This attempt to use the Task Force Report as a basis for inferring legislative intent regarding section 224.2, subdivision (b) fails for two reasons.

First, there is no indication that any legislator, committee, or other participant in the process of passing Assembly Bill 3176 was aware of the Task Force Report, much less that any legislator, committee, or other participant considered any particular statement in that report relevant to the adoption of section 224.2, subdivision (b).  Thus, the report is not properly considered as shedding light on the legislative intent.  (See *In re Ezequiel G.*, *supra*, 81 Cal.App.5th at pp. 1011-1012 [noting that there is no reference to the Task Force Report in any legislative reports on Assembly Bill 3176 or evidence the report was before the Legislature or reflects its intent]; *Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425 ["a court will generally consider only those materials indicative of the intent of the Legislature as a whole"], italics omitted.)  As noted in *Metropolitan Water Dist.*, "[m]aterial showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered.  [Citations.]  This is because such materials are generally not evidence of the legislature's *collective* intent.  [Citations.]  For the same reason, letters to various legislators and to the Governor expressing opinions in support of or opposition to a bill [citation] press releases by a bill's author [citation] and enrolled bill reports [citations] generally should not

29

be considered." (*Metropolitan Water Dist., supra,* at p. 1426, fn. omitted.)

Second, in contrast to the absence of any mention of the Task Force Report in the legislative history, there is clear evidence that the Legislature did consider the BIA Guidelines when adding section 224.2, subdivision (b) to Assembly Bill 3176. Those guidelines were actually referenced in the relevant legislative report and a number of provisions added to the bill at the time align with this federal guidance. This material is inconsistent with the broad interpretation of section 224.2, subdivision (b) in aid of which the Task Force Report has been cited. (See discussion, *ante.*)

> 7. *The Implications of a Plain-meaning Construction of Section 224.2, Subdivision (b) Must be Understood in the Context of Other Inquiry Provisions*

As a final consideration of whether the construction of section 224.2, subdivision (b) proposed here runs afoul of broader principles of statutory interpretation, it is important to consider the practical implications in light of three other inquiry provisions in the statute. Although section 224.2, subdivision (b) is properly understood to impose a relatively narrow duty to question extended family members, these other provisions in the statute may require such inquiries in particular circumstances.

First, the mandate in section 224.2, subdivision (a) of an "affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child," applies in every case and is one the juvenile courts must enforce. As noted, *ante,* this provision, which predates the changes made by Assembly Bill 3176, does not specifically require inquiry of extended family members. However, if anything is clear from the harmless error

30

jurisprudence that has emerged from the hundreds of initial ICWA inquiry appeals over the past year, it is that there may be a variety of case-specific circumstances meriting more extensive inquiries and diligent follow up regarding a child's potential status as an Indian child. This may necessitate making early inquiries of extended family members in specific cases. As this body of judicial guidance establishes, simply relying on a parent's self-reporting about Indian ancestry or about the parent's and child's existing and potential affiliation with any Indian tribe, may fall short of an adequate ICWA inquiry under section 224.2, subdivision (a).[23] However, the fact that case-specific circumstances may lead the juvenile court to require inquiries of extended family members in order to meet the general duty of inquiry provided in section 224.2, subdivision (a), does not mean that this subdivision should be interpreted to require such inquiries in every case when neither the text nor the legislative history of that provision would support such a broad construction.

In addition, when the Legislature added section 224.2, subdivision (b) it also expanded the statutorily-mandated inquiries at the initial hearings under section 224.2, subdivision (c) to include, not only questioning the parties, but all

---

[23] See *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015-1016, 1018 (remanding for compliance with § 224.2, subd. (b) in matter where mother who grew up in foster care may lack information regarding family cultural history to make reliable representation that she has no Indian ancestry); *In re Y.W.* (2021) 70 Cal.App.5th 542, 555, 559 (ordering juvenile court to ensure compliance with ICWA inquiry and notice provisions in matter where the mother was adopted at age two and had no contact with biological parents).

"participant[s]." This requires questioning family members who appear at such hearings regarding whether the child is or may be an Indian child.[24] This provision is based on the 2016 federal regulations. (See 25 C.F.R. § 23.107(a) ["State courts must ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record. State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child"].)

Although neither the federal regulations nor the California statute expressly defines "participant," section 224.2, subdivision (c), which refers to both "parties" and "participants," should be construed to require questioning of any family members on ICWA issues if they appear at the hearing. This interpretation gives effect to the Legislature's choice of words, and it also comports with the intent of the drafters of the related federal regulation. As the adopting release for the 2016 federal regulations explained, "[t]he court is to ask each participant in the proceeding, including attorneys, whether they know or have reason to know that the child is an Indian child. Such participants could also include the State agency, parents, the

---

[24] Section 224.2, subdivision (c) provides "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."

custodian, *relatives* or trial witnesses, depending on who is involved in the case."  (81 F.R. 38803, italics added.)

Finally, the Legislature has also created a clear statutory obligation to interview extended family members under section 224.2, subdivision (e) when there is "reason to believe" that a child in a dependency proceeding may be an Indian child.  This is another provision that will require the juvenile courts to make an assessment in particular cases that may result in questioning of extended family members about a child's potential status as an Indian child.

Taken together with the narrowly focused inquiry obligation the Legislature established in section 224.2, subdivision (b), these comprehensive inquiry provisions can be expected to result in questioning extended family members in a number of circumstances where such inquiry is determined to be reasonably necessary to reach an appropriate conclusion whether ICWA applies.  Thus, even though it can be expected that the *quantity* of inquiries directed to extended family members about a child's potential status as an Indian child will decline under the interpretation of section 224.2, subdivision (b) outlined in this concurrence, this construction, which honors the Legislature's expressed language, the drafting history of the provision and its genesis in federal ICWA guidance, should not impair in any meaningful way the *quality* of ICWA inquiries in juvenile dependency cases.

The main opinion in this case affirms based on finding any ICWA inquiry error harmless.  Notwithstanding that result, I have written at some extended length to make the case for construing section 224.2, subdivision (b) narrowly for two reasons.  First, our interpretation should conform to what the Legislature expressed and intended when it adopted the statute.

33

Second, the broader prevailing interpretation, which I believe to be incorrect, has placed significant and unnecessary burdens on the courts; perhaps not consciously, but due to an unusual confluence of circumstances. It is understandable that a parent's counsel would scour a record for errors that might provide a basis for an appeal from an order terminating parental rights. And once section 224.2, subdivision (b) began to be interpreted as mandating the questioning of extended relatives in every case, it was inevitable that the issue would be raised in virtually every appeal, even where (as has so often been the case, including in this case) no other error had been identified. What is less understandable is the approach of DCFS, which routinely failed to inquire of extended relatives and now prevails upon the appellate courts to redress what it concedes to be its routine violation of section 224.2, subdivision (b) by deeming the errors "harmless."

A report on California's appellate system issued nearly 30 years presciently describes the potential harms that can flow from the intersection of such circumstances and also explicates why I believe the preferred approach here should be to declare "no error" rather than "harmless error."

"The harmless error doctrine creates several types of burdens upon appellate courts. First, it takes significant time for the appellate court to engage in a harmless error analysis. In order to do it well, the court must immerse itself in the complete record. There is no apparent alternative way for a court to determine whether, absent the erroneous exclusion or introduction of a particular piece of evidence, it is reasonably probable that a result more favorable to appellant would have occurred.

34

"Second, in considering whether an error is harmless, the appellate court is required to do more than merely search for 'substantial evidence' in support of the judgment. The court is supposed to come to a judgment about the probabilities that the error affected the outcome. Yet that is precisely the sort of speculative inquiry into the factual basis of a judgment that appellate tribunals are relatively ill-equipped to perform.

"Third, the harmless error doctrine would seem to undermine the appellate court's error correction function and to encourage essentially useless appeals. Characterizing an error as harmless sends a very mixed signal to the bench and bar. On the one hand, the court has found an error, but on the other hand, it appears to be an error that the lower tribunal is permitted to make. In that sense, it is not an error at all. And, if it is not really an error (or, more properly, not an error to which serious consequences attach), then there is no reason for the lower tribunal to avoid that error in the future. In this way, the harmless error doctrine may actually perpetuate avoidable, repetitive errors by lower courts, errors that form the basis for more appeals in the future. This consequence, in turn, undermines the appellate court's goal of achieving uniformity in the application of the law by lower courts and, more importantly, may significantly undermine the public's confidence in the judicial system." (Kelso, *A Report on the California Appellate System*, 45 Hastings L.J. (1994) 433, 476-477, fns. omitted.)

For all of these reasons, I would also affirm on the ground that there was no inquiry error.

KELLEY, J.*

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.